SPILLER *v.* ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY.

SPILLER *v.* CHICAGO & EASTERN ILLINOIS RAILROAD COMPANY.

SPILLER *v.* CHICAGO & ALTON RAILROAD COMPANY.

SPILLER *v.* MISSOURI PACIFIC RAILWAY COMPANY.

SPILLER *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY.

SPILLER *v.* ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY.

SPILLER *v.* CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.

SPILLER *v.* ILLINOIS CENTRAL RAILROAD COMPANY.

SPILLER *v.* MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

ERROR AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 137–145. Argued January 15, 1920.—Decided May 17, 1920.

In cases of a class which may ultimately reach this court by writ of error under Jud. Code, §§ 128 and 241, this court has jurisdiction to review by certiorari judgments of the Circuit Court of Appeals

which are not final in the sense of concluding the litigation, such jurisdiction arising under § 262 when the jurisdictional amount prescribed by § 241 is in controversy and under § 240 when it is not. P. 120.

This jurisdiction will be exercised in proper cases to avoid protraction of the litigation. P. 121.

The courts cannot refuse to enforce a reparation order upon the ground that the evidence before the Interstate Commerce Commission was insufficient to sustain it when substantial documentary evidence that was before the Commission is not produced at the trial. P. 125.

The Act to Regulate Commerce allows the Commission wide latitude in the investigation of claims for reparation, and its finding and order may not be rejected as evidence because of errors in its procedure not amounting to a denial of a fair hearing, so long as the essential facts found are based on substantial evidence. P. 126.

In a proceeding in which the Commission awarded reparation for excessive freight charges on many shipments of cattle consigned to commission companies by many shippers over many railroads, a witness who had gathered the details of the shipments in some cases from shippers but mainly from the commission companies, presented them at the hearings and further testified that the shippers rarely kept books, relying on the commission companies to do so, and that the practice of the latter was to pay the freight, sell the cattle and remit the proceeds to their owners minus the freight paid and other charges; the evidence was received without objection and summaries showing the details of the shipments, rate paid, overcharge claimed, etc., were submitted to the carriers and "O.K.'d" after comparison with their books. *Held*, that this evidence, including the admissions that might be implied from the carriers' approval of the summaries, was sufficient to justify the Commission in finding that the shipments were made as claimed and the overcharges paid ultimately by the shippers. P. 127.

A decision by the Commission that a witness before it is qualified as an expert must be accepted by the courts unless clearly unfounded. P. 130.

An order of the Commission is not to be rejected because based in part on hearsay evidence, if the evidence was received without objection and was substantially corroborated by other evidence original and admissible against the parties affected. *Id.*

In view of the character of its functions and the fact that its reparation orders are at most *prima facie* evidence, the Commission should not

be narrowly constrained as to the evidence it may receive in the conduct of reparation hearings.  P. 131.

If only part of the claims for which reparation was awarded were sustained by evidence, objection should be directed to the others and not to the order as a whole.  *Id.*

In a hearing for reparation, payment of a published rate afterwards decided to have been excessive is evidence that the party who paid the freight sustained damage to the extent of the excess.  P. 132. *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.,* 245 U. S. 531.

In a reparation hearing, assignments of claims to the secretary of a cattle raisers' association were offered and their filing waived, and there was evidence that they had been made for nominal considerations because the association was prosecuting the claims for their owners.  *Held,* that formal proof of the handwriting of the assignors was unnecessary.  P. 133.

An assignment of the legal title only will confer on the assignee the right to claim an award of reparation and enable him to sue upon it in his own name, but for the benefit of the equitable owner. P. 134.

A claim for damages sustained through the exaction of unreasonable freight charges is assignable at law, if no statute prevents; and there is nothing in the letter or spirit of the Commerce Act inconsistent with such assignability.  P. 135.

The ruling of the Commission declaring that an assignment to a stranger to the transportation records will not be recognized is erroneous as a construction of the act, and, treated as an administrative regulation, did not limit the Commission's jurisdiction to recognize such assignments.  P. 136.

246 Fed. Rep. 1; 249 *id.* 677, reversed.


THE case is stated in the opinion.


*Mr. Buckner F. Deatherage,* with whom *Mr. Samuel H. Cowan, Mr. I. H. Burney* and *Mr. Goodwin Creason* were on the briefs, for plaintiff in error and petitioner.


*Mr. T. J. Norton,* with whom *Mr. Gardiner Lathrop, Mr. C. S. Burg* and *Mr. James L. Coleman* were on the brief, for defendants in error and respondents.

MR. JUSTICE PITNEY delivered the opinion of the court.

Plaintiff in error commenced an action against defendants in error jointly in the District Court of the United States for the Western District of Missouri under § 16 of the Act to Regulate Commerce as amended (Act of February 4, 1887, c. 104, 24 Stat. 379, 384; June 29, 1906, c. 3591, 34 Stat. 584, 590; June 18, 1910, c. 309, 36 Stat. 539, 554), to recover certain amounts awarded to him against them respectively in a reparation order made by the Interstate Commerce Commission January 12, 1914. His petition contained also a count setting up a conspiracy between defendants for the restraint of interstate commerce, and claiming treble damages under § 7 of the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209, 210; but this was abandoned at the trial. Defendants having filed separate answers, a jury was waived by stipulation, and a test case tried before the court—all defendants participating—with the result that a decision was rendered in favor of plaintiff, pursuant to which a combined judgment was entered, amounting in effect to as many judgments as there were defendants, each for the amount of the Commission's award against the particular defendant with interest and attorneys' fees. Defendants sued out separate writs of error from the Circuit Court of Appeals, where, by stipulation, the cases were heard together upon a single record. That court reversed the judgments, ordered the cause remanded to the District Court with directions to grant a new trial (246 Fed. Rep. 1), and refused an application for a rehearing (249 Fed. Rep. 677). Writs of error were prayed for and allowed for the review of the judgments of reversal in this court; and afterwards but in due season a petition for the allowance of a writ of certiorari was filed, the consideration of which was postponed to the hearing under the writs of error.

The jurisdiction of the District Court having been in-

voked not because of diversity of citizenship but because
the suit was one arising under laws of the United States
other than those particularly mentioned in § 128, Judicial
Code, as amended (Act of January 28, 1915, c. 22, § 2, 38
Stat. 803), it follows that the judgments were not made
"final" by the section referred to, and, if final in the sense
of concluding the litigation, would be reviewable in this
court by writ of error pursuant to § 241, Judicial Code, in
each case where the matter in controversy exceeds one thou-
sand dollars besides costs.   In the cases of the Chicago &
Alton and the Missouri Pacific Companies, the respective
judgments with interest up to the issuance of the writs of
error from this court were materially less than one thousand
dollars; in each of the other cases substantially in excess of
that amount; the aggregate of the judgments being more
than $150,000.   For want of a sufficient amount in con-
troversy the two smaller judgments would not be review-
able here by writ of error even were they final in effect; but
all the writs of error must be dismissed because the judg-
ments call for further proceedings in the trial court; it
being elementary that this writ will lie to review final
judgments only.   *McLish* v. *Roff*, 141 U. S. 661, 665; *Lux-
ton* v. *North River Bridge Co.*, 147 U. S. 337, 341; *Heike*
v. *United States*, 217 U. S. 423, 429.

.However, upon consideration of the particular circum-
stances of the case, we have concluded that a writ of
certiorari ought to be allowed, without further protracting
the litigation to the extent that would be necessary in
order to reach final judgments; the transcript of the record
and proceedings returned in obedience to the writs of error
to stand as the return to the writ of certiorari.   This writ
is allowable by virtue of § 240, Judicial Code, (derived
from § 6 of the Act of March 3, 1891, c. 517, 26 Stat. 826,
828) in the case of the two smaller judgments, because the
decision of the Circuit Court of Appeals is made final by
the combined effect of §§ 128 and 241; and in the case of

the larger judgments it is allowable under § 262 of the
Code (§ 716, Rev. Stats.), in aid of the ultimate jurisdic-
tion of this court to review those cases by writs of error.
*Lau Ow Bew* v. *United States*, 144 U. S. 47, 58; *In re Chet-
wood*, 165 U. S. 443, 462; *Whitney* v. *Dick*, 202 U. S. 132,
135; *McClellan* v. *Carland*, 217 U. S. 268, 277, *et seq.;*
*United States* v. *Beatty*, 232 U. S. 463, 467; *Meeker* v.
*Lehigh Valley R. R. Co.*, 234 U. S. 749; 236 U. S. 412, 417.

Coming to the merits: The ground upon which the
Circuit Court of Appeals reversed the judgments, and the
ground principally relied upon to sustain its decision, was
the refusal by the trial court of a motion made by defend-
ants to hold: (a) That upon all the evidence plaintiff was
not entitled to recover against any or all of the defendants;
and (b) that there was not sufficient evidence before the
Commission to sustain its order of reparation. The latter
is the substantial question actually presented.

The course of proceedings at the trial, as appears from
the bill of exceptions, was as follows: Plaintiff introduced
the report of the Interstate Commerce Commission (un-
reported opinion No. A-583 in case No. 732, *Cattle Raisers'
Association of Texas* v. *Missouri, Kansas & Texas Ry. Co.*,
dated January 12, 1914), and the order of reparation made
pursuant to it and upon which the action was based.
Defendants having admitted the service of the order, and
that the money awarded had not been paid, plaintiff
rested. The report makes an award in favor of Spiller,
plaintiff in error, as assignee of a large number of claims
for reparation by reason of excessive rates charged by the
respective carriers on interstate shipments of cattle from
points of origin in Texas, Oklahoma, New Mexico, Colo-
rado, and Kansas, to destinations at Kansas City, St.
Louis, Chicago, St. Joseph, and New Orleans, on various
dates between August 29, 1906, and November 17, 1908;
and a further award to named shippers in the case of cer-
tain unassigned claims pertaining to similar shipments; the

several claims, assigned and unassigned, with distinguishing marks, being set forth in Appendix A, showing the delivering carriers against which the claims were allowed and, in each case, the consignor, points of origin and destination, number of cars shipped, weight, rate paid, the lower rate sanctioned by the Commission, amount of refund required, and the interest thereon. The report contains appropriate findings adequate to support the award, among them the following: That the persons named in Appendix A as consignors shipped from the points of origin to the points of destination specified, by the line of road named as the "delivering road," the number of cars and of the aggregate net weight stated; that the shippers paid to the delivering carriers freight upon the shipments at certain rates named; that in each instance this rate was unreasonable and excessive, and a reasonable rate to have been charged would have been the lower rate specified as having been subsequently established by the Commission, and that therefore the delivering carriers collected from the shippers unreasonable charges on account of the shipments in amounts named in the column headed "Amount of Refund"; that the shipments of live stock were in all cases consigned to some person at the delivering market, usually a commission firm; that the freight was paid in the first instance by the "consignor" (evidently a misprint for "consignee") to the delivering carrier, and subsequently the cattle were sold upon the market and the amount of the freight deducted from the purchase price, remittance being made for the balance, so that in all cases the owner and shipper of the cattle finally paid the transportation charges; and that by the unreasonable exactions of the carriers the shippers were damaged in the amounts stated in the appropriate column of Appendix A, since they received for the cattle less by those amounts than they would have received had the rate found reasonable been charged; that in the case of

some of the claims the shippers made assignments to
H. E. Crowley, then being secretary of the Cattle Raisers'
Association, in a form set forth in the report; that sub-
sequently Crowley ceased to be such secretary, and was
succeeded by Spiller, the plaintiff, to whom Crowley
assigned all claims previously assigned to him; and that
other specified claims were assigned by the shippers to
Spiller after he became secretary, the form of assignment
being the same as that previously employed.

Defendants, endeavoring to show the insufficiency of the
evidence upon which the findings and order of the Com-
mission were based, introduced a transcript of the stenog-
rapher's notes of the testimony taken upon the hearing
of the reparation claims; following this by introducing a
sample page taken from one of the exhibits introduced
before the Commission as illustrative of the form of
exhibits there introduced. After other evidence not
necessary to be mentioned, and a request for judgment in
favor of defendants, and for certain rulings on points of
law that would have produced that result, all of which
were refused, the case was closed.

It appears that in February, 1904, the Cattle Raisers'
Association of Texas, in behalf of its members and of others
interested, petitioned the Interstate Commerce Commis-
sion under § 13 of the Commerce Act, alleging the rates in
force in the territory in question to be unjust and unrea-
sonable, they having been advanced some time before to
the extent (in most cases) of 3 cents per hundred pounds.
On August 16, 1905, the Commission held (*Cattle Raisers'
Association of Texas* v. *Missouri, Kansas & Texas Ry. Co.*;
11 I. C. C. 296, 352) that the then existing rates were
unjust and unreasonable by the amount of the advance.
At this time the Commission was not empowered to fix
rates for the future. This power having been conferred by
the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584, 589,
which, by Joint Resolution of June 30, 1906, 34 Stat. 838,

took effect sixty days after its approval by the President, or on August 28, 1906, the Cattle Raisers' Association immediately thereafter applied for and obtained a reopening of the matter, to the end that reasonable rates might be established; and on April 14, 1908, the Commission decided that the former rates should be restored, but that reparation would not be allowed upon claims accruing prior to August 29, 1906 (date of the application). 13 I. C. C. 418, 435. The reduced rates finally were put into effect November 17, 1908.

The reparation claims in controversy appear to have been filed in due season by the Cattle Raisers' Association in behalf of its members and other shippers interested, and in the names of the alleged owners of the cattle shipped.

The transcript of the testimony taken by the Commission, as introduced in evidence in the District Court, forms the basis of the decision of the Circuit Court of Appeals that the reparation order was unsupported by evidence. But the transcript shows that important documentary evidence was introduced, and furnished the principal foundation for the findings made. This documentary evidence (except the single sheet offered for purposes of illustration) was not introduced in the District Court, in order, as stated by counsel, to "avoid introducing a number of papers that would almost fill a farm wagon." But obviously we hardly could sustain a decision rejecting the reparation order upon the ground that there was not sufficient evidence before the Commission to support it when the whole of the evidence that was before the Commission was not produced.

That this is a matter of substance will appear from a review of the course of the proceeding as disclosed by the stenographer's transcript. The evidence was taken by Mr. Commissioner Prouty at Chicago; there being three sessions, the first on September 19 and 20, 1912, the second on January 24 and the third on October 17 in the following year. They were held in the presence of counsel for the

Cattle Raisers' Association, who appeared for the claimants, and counsel for the several carriers interested. If we were called upon to review the proceeding as upon a writ of error or appeal it might be difficult to say that no improper evidence was admitted, that production of the best available was insisted upon, or that a different conclusion might not have been reached upon that which was admitted. But the scope of the judicial review is not so extensive. Section 13 of the Act to Regulate Commerce (Act of February 4, 1887, c. 104, 24 Stat. 379, 383; amended June 18, 1910, c. 309, 36 Stat. 539, 550) requires the Commission on receipt of a claim for reparation to proceed on notice to the carrier to "investigate the matters complained of in such manner and by such means as it shall deem proper"; and by § 16 (34 Stat. 590; 36 Stat. 554), if, after such hearing, the Commission shall determine that any party complainant is entitled to an award of damages, the Commission is to make an order of reparation accordingly, and in a suit based thereon "the findings and order of the commission shall be prima facie evidence of the facts therein stated." The same section contemplates that numerous parties may unite in a claim for reparation, and that numerous carriers may be joined as defendants; and similarly that in a suit brought upon such award there may be a joinder of parties plaintiff and defendant. And, by § 17 (24 Stat. 385; 25 Stat. 861), "the Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice."

These provisions allow a large degree of latitude in the investigation of claims for reparation, and the resulting findings and order of the Commission may not be rejected as evidence because of any errors in its procedure not amounting to a denial of the right to a fair hearing, so long as the essential facts found are based upon substantial evidence.

In the present case, the hearing was informal, but not to the extent of sacrificing essential rights of parties; and it cannot be characterized as arbitrary or unfair.   Many carriers were interested, and they were represented by counsel.   Thousands of carload shipments were in question, but the points in real controversy were few, and there was a natural desire on all sides to expedite the hearing. In the main, counsel for the carriers coöperated in facilitating the investigation.   It was not in dispute that all shipments under inquiry were made during a period when the tariff rates were under investigation, and that afterwards those rates were determined by the Commission to have been excessive.   It appeared that itemized claims for reparation had been made out in duplicate (one copy of each being filed), in the names of the parties alleged to have made shipments of cattle as owners during the period in question, that these were based in most cases upon data furnished by the commission houses at the several points of destination, as taken from their books, in other cases by the shippers themselves, and that they were computed by applying the excess charges, as determined, to the actual weights of the shipments where known, in other cases to the minimum carload weights.  There was evidence that few of the cattle shippers kept books, they relying upon the commission companies to do this, and that such companies were the consignees of the cattle, and made it a practice on receiving a shipment to pay the freight, sell the cattle, and remit the proceeds to the owner after deducting the freight paid and other charges.   During the hearing, there was drawn off from the claims as made up and filed a summary for each carrier, purporting to show the consignor, consignee, originating road, point of origin, destination, date of delivery, number of cars moved, rate paid, rate established by the Commission, and the overcharge claimed.   These were submitted to the several carriers for investigation by their accounting officers, and

some months later were reported back to Commissioner
Prouty by their counsel with the results of such investi-
gation, which in a majority of instances verified the state-
ments said to have been deduced from the records of the
commission houses.    In some cases, in addition to check-
marks, "O. K." and other marks indicating that the items
had been found correct, waybill references, car numbers,
initials, etc., had been inserted; and where it had been
found impossible to locate a shipment there were comments
tending to add support to the verification of those that
were located.    No reparation was awarded by the Com-
mission except with respect to such shipments as were ac-
knowledged in the reports of the defendants to have
moved as stated.    These reports were introduced in
evidence before Commissioner Prouty, but, as already
shown, were not in evidence before the District Court.
What we have said as to their contents is gathered from
the stenographer's transcript; what else may have ap-
peared upon their face, in the nature of admissions, is left
to be inferred.    Counsel for some of the carriers undertook
to qualify the effect of admissions contained in them, as by
saying that the checking meant no more than that a
particular car moved as stated, and that the carrier
collected the amount of freight specified; that it was not
intended to admit that remittance was made to the person
named as claimant; that the statements were subject to
confirmation by the books of the commission merchants,
or the like.    But the Commission was justified in according
to the reports of the checking an evidential effect, not
limited by the qualifying statements, treating the latter
as merely argumentative.    It might regard the fact that
the shipments could be and were identified from the
records of the carriers, in the manner described, as evi-
dence that the details respecting the shippers of the cattle
and the particulars of the shipments were true; might
take the movement and delivery of the freight thus

acknowledged as evidence that the delivering carrier collected the freight charges according to the published tariffs, which of course included the overcharges; and might take this, in connection with the evidence as to the course of business, as showing that the shippers whose names were mentioned in the statements sustained damages to the extent of the excessive charge as determined by the Commission. The minutes show that until near the conclusion of the hearing it was the intention to appoint an examiner to investigate the books of the commission merchants at the various points of destination in order to verify the details of the several shipments, and that this purpose was abandoned in view of the admissions made by the carriers. Perhaps it ought to have been carried out; but the court was not justified in treating the report of the Commission as a nullity for this reason, if there was substantial evidence of the essential facts without such verification. We think that what we have detailed of the course of the hearing, taken in connection with what we know and what may be presumed as to the contents of the unproduced documentary evidence, shows there was substantial evidence that the owners specified in the claims had been subjected to the excessive charges with respect to the shipments acknowledged by the carriers; and, as already remarked, the award of reparation was confined to these shipments.

The opinion of the Circuit Court of Appeals severely criticizes the evidence on which these conclusions were based, characterizing it as hearsay. It is not to be disputed that much of the evidence—including essential parts of it—is properly so characterized. The only witness sworn was Mr. Williams, assistant secretary of the Cattle Raisers' Association, who had gathered the data upon which the claims were based, mostly from commission merchants, in some instances from the cattle shippers. He had prepared the claims, had spent much

time and pains in investigating them, and in the course of his duties had visited several of the points of destination and examined the books and records of the commission merchants to ascertain the method in which their business was conducted and records kept. It was he who testified as to the customary course of business of cattle shippers and commission merchants. He had been connected with the Cattle Raisers' Association for about eight years, and might be presumed to have some general familiarity with the business in addition to that gained in the special study he had made of it while investigating the claims. His explanation of the method of business and the details of the claims was accepted, and accepted without objection, very much as the testimony of an expert witness might have been accepted. Whether he had shown such special knowledge as to qualify him to testify as an expert was for the Interstate Commerce Commission to determine; and its decision thereon is not to be set aside by the courts unless clearly shown to have been unfounded, which cannot be said in this case. *Stillwell Mfg. Co.* v. *Phelps,* 130 U. S. 520, 527; *Montana Ry. Co.* v. *Warren,* 137 U. S. 348, 353.

The evidence was not objected to as hearsay when introduced, nor, indeed, at any time during the hearing before the Commission. Counsel did in some instances assert that there was a failure of proof and suggest that the proceeding ought to be dismissed. But the objections came too late, and were too general in character, to be equivalent to an objection to the reception of the evidence because hearsay. Even in a court of law, if evidence of this kind is admitted without objection, it is to be considered, and accorded its natural probative effect, as if it were in law admissible: *Diaz* v. *United States,* 223 U. S. 442, 450; *Rowland* v. *St. Louis & San Francisco R. R. Co.,* 244 U. S. 106, 108; *Damon* v. *Carrol,* 163 Massachusetts, 404, 408. And it is clear that the verification of the details of the

claims by the carriers after full investigation by their auditing departments constituted primary evidence against them, and went far towards showing that the facts as disclosed by the hearsay evidence might be depended upon.

We are not here called upon to consider whether the Commission may receive and act upon hearsay evidence seasonably objected to as hearsay; but we do hold that in this case, where such evidence was introduced without objection and was substantially corroborated by original evidence clearly admissible against the parties to be affected, the Commission is not to be regarded as having acted arbitrarily, nor may its findings and order be rejected as wanting in support, simply because the hearsay evidence was considered with the rest.

In *Interstate Commerce Commission* v. *Baird*, 194 U. S. 25, 44, it was said: "The inquiry of a board of the character of the Interstate Commerce Commission should not be too narrowly constrained by technical rules as to the admissibility of proof. Its function is largely one of investigation and it should not be hampered in making inquiry pertaining to interstate commerce by those narrow rules which prevail in trials at common law where a strict correspondence is required between allegation and proof." In *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 227 U. S. 88, 93, the court recognized that "The Commission is an administrative body and, even where it acts in a quasi-judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties." And the fact that a reparation order has at most only the effect of *prima facie* evidence (*Meeker & Co.* v. *Lehigh Valley R. R. Co.*, 236 U. S. 412, 430; *Meeker* v. *Lehigh Valley R. R.*, 236 U. S. 434, 439; *Mills* v. *Lehigh Valley R. R. Co.*, 238 U. S. 473, 482), being open to contradiction by the carrier when sued for recovery of the amount awarded, is an added reason for not binding down the

Commission too closely in respect of the character of the
evidence it may receive or the manner in which its hearings
shall be conducted.

In this case the Commission did not act upon evidence
of which the carriers were not cognizant and to which they
had no opportunity to reply, as in the case supposed in
*Interstate Commerce Commission* v. *Louisville & Nashville
R. R. Co.*, 227 U. S. 88, 91, 93. All the carriers participated
in the hearing, and had full opportunity to object, to
cross examine, and to introduce evidence on their own
part.

It is objected that the evidence failed to show who
owned the cattle shipped or who paid the freight. This
cannot be sustained. True, it appeared that the cattle
were not in all instances billed in the name of the owner,
but sometimes in the name of a caretaker, his name being
inserted in the bill as evidence of his right to free transpor-
tation. But it is probable that in the latter cases there was
a want of correspondence between the claims as presented
and the carriers' books, and that for want of checking by
the carriers they were omitted from the award. The
evidence upon the whole was sufficient to sustain a finding,
so far as the claims were allowed, that the parties in whose
behalf they were allowed were consignors of the shipments
and presumably owners of the cattle shipped.

If there be doubt whether it was sufficient to sustain
each and every claim that was allowed, we are not now
concerned with this; the ruling in question being the refu-
sal of the trial court to treat the award as void *in toto*.
This was not erroneous if to any substantial extent the
award was legally valid. If a part only of the claims was
unsupported by evidence, the request for an adverse ruling
should have been directed to these.

The principal defense before the Commission was that
the payment of a published rate afterwards decided to have
been excessive was not evidence that the party who paid

the freight sustained damage to the extent of the excess. The Circuit Court of Appeals sustained this contention at the first hearing, 246 Fed. Rep. 1, 23.   But it has since been ruled otherwise by this court, *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 534; and, in view of this, upon the rehearing the Circuit Court of Appeals withdrew this part of its former opinion, 249 Fed. Rep. 677.

That court held, further, that upon the undisputed evidence the legal title to the claims for reparation never vested in Spiller, and hence that the Commission was wholly without authority to order reparation to be made to him.   The minutes show that of the claims in favor of Spiller a number had been assigned to Crowley when he was secretary of the Cattle Raisers' Association, and afterwards assigned by him to Spiller when Crowley retired and Spiller succeeded him; that other claims were assigned by the consignors to Spiller direct; and that still others had not been assigned.   The assignments were produced before Commissioner Prouty, and an offer made to file them, but as we interpret the minutes this was waived, a copy of one of the assignments (they were said to be alike in form) being inserted in the stenographer's notes instead.   There was evidence that the assignments were made for nominal considerations because the Cattle Raisers' Association was prosecuting the claims for the benefit of the owners thereof.   In the schedule of the claims as submitted to the Commission those assigned were suitably identified, and the Commission awarded reparation to Spiller upon these, and in other cases made the order in favor of the parties named as owners.   There was substantial evidence to support the finding that the claims had been assigned.   Formal proof of the handwriting of the assignors by subscribing witnesses or otherwise was not necessary in so summary a hearing, in the absence of objection or contradiction.   What was shown as

to the relation of the shippers to the Association and the possession of the instruments of assignment by the representative of the Association who was prosecuting the claims gave a reasonable assurance of the genuineness of the instruments.

The Circuit Court of Appeals held further, however, that, supposing there was sufficient evidence to support the finding that the claims had been legally assigned to Spiller, it showed that the purpose of the assignment was not such as to vest the legal title to the claims in him so as authorize the Commission to make the award of damages in his name. To this we cannot assent. The assignments were absolute in form, and plainly their effect—supposing the claims to be assignable—was to vest the legal title in Spiller. What they did not pass to him was the beneficial or equitable title. But this was not necessary to support the right of the assignee to claim an award of reparation and enable him to recover it by action at law brought in his own name but for the benefit of the equitable owners of the claims; especially since it appeared that such was the real purpose of the assignments.

We have said enough to show that the reversal of the judgments of the District Court cannot be sustained on the grounds upon which the Circuit Court of Appeals based it. It is insisted, however, that, failing this, the same result ought to have been reached upon the ground that the provisions of the Commerce Act do not permit an assignment of a claim for reparation to a third party and hence the Interstate Commerce Commission was without jurisdiction to award reparation to Spiller. This is based upon the language of §§ 8 and 9, which remain in their original form, of § 13, as amended June 18, 1910, c. 309, 36 Stat. 550, and of § 16 as amended June 29, 1906, 34 Stat. 584. Section 8 (24 Stat. 382) makes the common carrier, for anything done contrary to the prohibition of the act, "liable to the person cr

persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act." Section 9 entitles any person claiming to be damaged either to make complaint to the Commission or to "bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable." Section 13 contains nothing that need be quoted. Section 16 as amended (34 Stat. 590) provides that where an award of damages is made by the Commission and the carrier does not comply with the order, "the complainant, or any person for whose benefit such order was made" may bring suit. Stress is laid upon the absence of language expressly extending the remedy to the representatives or assigns of the person aggrieved; but we attribute no controlling significance to this. The provisions of the act giving redress, compensatory in its nature, to persons sustaining pecuniary injury through the violation of public duty by the carrier must receive a reasonably liberal and not a narrow interpretation. A claim for damages sustained through the exaction of unreasonable charges for the carriage of freight is a claim not for a penalty but for compensation, is a property right assignable in its nature (*Comegys* v. *Vasse*, 1 Pet. 193, 213; *Erwin* v. *United States*, 97 U. S. 392, 395–396), and must be regarded as assignable at law, in the absence of any expression of a legislative intent to the contrary. We find nothing in the letter or spirit of the act inconsistent with such assignability. We are referred to certain expressions in *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 442, and *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 533–534; but they do not bear upon the present question, and are not inconsistent with the view that reparation claims are assignable.

The Interstate Commerce Commission, by Conference Ruling No. 362 (June 4, 1912), declared: "In awarding reparation the Commission will recognize an assignment

by a consignor to a consignee or by a consignee to a consignor, but will not recognize an assignment to a stranger to the transportation records." See *Robinson Co. v. American Express Co.*, 38 I. C. C. 733, 735. So far as this involves a construction of the act, we are unable to accept it, for reasons that have been indicated. Treating it as an administrative regulation, it of course constituted no limitation upon the jurisdiction of the Commission, even were it consistent with a correct construction of the act, which we hold it was not. In any event, the Commission had power to disregard the regulation, as in effect it did by recognizing the assignments in this case.

Other points discussed in the argument require no special comment.

It results that the judgments of the Circuit Court of Appeals must be reversed, and those of the District Court affirmed.

*Writs of error dismissed.*

*Writs of certiorari allowed.*

*Judgments of Circuit Court of Appeals reversed, and judgments of District Court affirmed.*