Chief Justice Roberts, with whom Justice Scalia, Justice Thomas, and Justice Alito join,
dissenting.
The majority concludes that a private litigant may sue in federal court despite having to “pass back ... all proceeds of the litigation,” Brief for Respondents 9, thus depriving that party of any stake in the outcome of the litigation. The majority reaches this conclusion, in flat contravention of our cases interpreting the case-or-controversy requirement of Article III, by reference to a historical tradition that is, at best, equivocal. That history does not contradict what common sense should tell us: There is a legal difference between something and nothing. Respondents have nothing to gain from their lawsuit. Under settled principles of standing, that fact requires dismissal of their complaint.[1]
I
Article III of the Constitution confines the judicial power of the federal courts to actual “Cases” and “Controversies.” §2. As we have recently reaffirmed, “[n]o principle is more fundamental to the judiciary’s proper role in our system of government than the constitutional limitation of *299 federal-court jurisdiction to actual cases or controversies.” Daimler Chrysler Corp. v. Cuno, 547 U. S. 332, 341 (2006) (quoting Raines v. Byrd, 521 U. S. 811, 818 (1997); internal quotation marks omitted). Unlike the political branches, directly elected by the people, the courts derive their authority under Article III, including the power of judicial review, from “the necessity ... of carrying out the judicial function of deciding cases.” Cuno, supra, at 340. That is why Article III courts “may exercise power only ... ‘as a necessity,’ ” that is, only when they are sure they have an actual case before them. Allen v. Wright, 468 U. S. 737, 752 (1984) (quoting Chicago & Grand Trunk R. Co. v. Wellman, 143 U. S. 339, 345 (1892)). “If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.” Cuno, supra, at 341.
Given the importance of ensuring a court’s jurisdiction before deciding the merits of a case, “[w]e have always insisted on strict compliance with th[e] jurisdictional standing requirement.” Raines, supra, at 819. And until today, it has always been clear that a party lacking a direct, personal stake in the litigation could not invoke the power of the federal courts. See Lujan v. Defenders of Wildlife, 504 U. S. 555, 573 (1992) (plaintiff must demonstrate a “concrete private interest in the outcome of [the] suit”); Lance v. Coffman, 549 U. S. 437, 439 (2007) (per curiam) (plaintiff must seek relief that “directly and tangibly benefits him” (quoting Lujan, supra, at 574; emphasis added; internal quotation marks omitted)); Larson v. Valente, 456 U. S. 228, 244, n. 15 (1982) (Article III requires a litigant to show that a favorable decision “will relieve a discrete injury to himself ’ (emphasis added)); Warth v. Seldin, 422 U. S. 490, 499 (1975) (“The Art. Ill judicial power exists only to redress or otherwise to protect against injury to the complaining party” (emphasis added)).
*300 In recent years, we have elaborated the standing requirements of Article III in terms of a three-part test — whether the plaintiff can demonstrate an injury in fact that is fairly traceable to the challenged actions of the defendant and likely to be redressed by a favorable judicial decision. See Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 102-103 (1998). But regardless of how the test is articulated, “the point has always been the same: whether a plaintiff ‘personally would benefit in a tangible way from the court’s intervention.’” Id., at 103, n. 5 (quoting Warth, supra, at 508; emphasis added). An assignee who has acquired the bare legal right to prosecute a claim but no right to the substantive recovery cannot show that he has a personal stake in the litigation. The Court’s decision today is unprecedented. Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U. S. 765 (2000), does not support it. Vermont Agency, in recognizing that a qui tarn relator as assignee of the United States had standing to sue, did not dispense with the essential requirement of Article III standing that the plaintiff have a “concrete private interest in the outcome of [the] suit.” Id., at 772 (quoting Lujan, supra, at 573; internal quotation marks omitted). In Vermont Agency, the qui tarn relator’s bounty was sufficient to establish standing because it represented a “partial assignment of the Government’s damages claim,” encompassing both a legal right to assert the claim and a stake in the recovery. 529 U. S., at 773. Thus, it was clear that the False Claims Act gave the “relator himself an interest in the lawsuit,” in addition to “the right to retain a fee out of the recovery.” Id., at 772.
Here, respondents are authorized to bring suit on behalf of the payphone operators, but they have no claim to the recovery. Indeed, their take is not tied to the recovery in any way. Respondents receive their compensation based on the number of payphones and telephone lines operated by their clients, see App. 198, not based on the measure of dam *301 ages ultimately awarded by a court or paid by petitioners as part of a settlement. Respondents received the assignments only as a result of their willingness to assume the obligation of remitting any recovery to the assignors, the payphone operators. That is, after all, the entire point of the arrangement. The payphone operators assigned their claims to respondents “for purposes of collection,” App. to Pet. for Cert. 114; respondents never had any share in the amount collected. The absence of any right to the substantive recovery means that respondents cannot benefit from the judgment they seek and thus lack Article III standing. “When you got nothing, you got nothing to lose.” Bob Dylan, Like A Rolling Stone, on Highway 61 Revisited (Columbia Records 1965).
To be sure, respondents doubtless have more than just a passing interest in the litigation. As collection agencies, respondents must demonstrate that they are willing to make good on their threat to pursue their clients’ claims in litigation. Even so, “an interest that is merely a ‘byproduct’ of the suit itself cannot give rise to a cognizable injury in fact for Article III standing purposes.” Vermont Agency, supra, at 773. The benefit respondents would receive — the general business goodwill that would result from a successful verdict, the ability to collect dial-around compensation for their clients more effectively — is nothing more than a byproduct of the current litigation. Such an interest cannot support their standing to sue in federal court. Cf. Steel Co., supra, at 107 (the costs of investigating and prosecuting a substantive claim do not give rise to standing to assert the claim); Diamond v. Charles, 476 U. S. 54, 70 (1986) (an interest in recovering attorney’s fees does not confer standing to litigate the underlying claim).
The undeniable consequence of today’s decision is that a plaintiff need no longer demonstrate a personal stake in the outcome of the litigation. Instead, the majority has replaced the personal stake requirement with a completely im *302 personal one. The right to sue is now the exact opposite of a personal claim — it is a marketable commodity. By severing the right to recover from the right to prosecute a claim, the Court empowers anyone to bring suit on any claim, whether it be the first assignee, the second, the third, or so on. But, as we have said in another context, standing is not “commutative.” Cuno, 547 U. S., at 352. Legal claims, at least those brought in federal court, are not fungible commodities.
The source of the Court’s mistake is easy to identify. The Court goes awry when it asserts that the standing inquiry focuses on whether the injury is likely to be redressed, not whether the complaining party’s injury is likely to be redressed. See ante, at 286-287. That could not be more wrong. We have never approved federal-court jurisdiction over a claim where the entire relief requested will run to a party not before the court. Never. The Court commits this mistake by treating the elements of standing as separate strands rather than as interlocking and related elements meant to ensure a personal stake. Our cases do not condone this approach.
The Court expressly rejected such an argument in Vermont Agency, where the relator argued that he was “suing to remedy an injury in fact suffered by the United States.” 529 U. S., at 771. We dismissed the argument out of hand, noting that “[t]he. Art. Ill judicial power exists only to redress or otherwise to protect against injury to the complaining party.” Id., at 771-772 (quoting Warth, 422 U. S., at 499; emphasis in Vermont Agency, internal quotation marks omitted). Although the Court’s analysis in that section of the opinion concerned the right of the relator to assert the United States’ injury, the Court treated it as axiomatic that any “redress” must also redound to the benefit of the relator.
In Steel Co., the Court similarly rejected a basis for standing that turned on relief sought — the imposition of civil penalties — that was “payable to the United States Treasury,” but not to the plaintiff. 523 U. S., at 106. We observed that *303 the plaintiff sought “not remediation of its own injury,” but merely the “vindication of the rule of law.” Ibid, (emphasis added). Importantly, the Court recognized that “[rjelief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.” Id., at 107. Again, the Court’s emphasis on the party’s injury makes clear that the basis for rejecting standing in Steel Co. was the fact that the remedy sought would not benefit the party before the Court.
The majority’s view of the Article III redressability requirement is also incompatible with what we said in Raines, 521 U. S. 811. In that case, we held that individual Members of Congress lacked standing to contest the constitutionality of the Line Item Veto Act. We observed that the Congressmen “do not claim that they have been deprived of something to which they personally are entitled.” Id., at 821. Rather, the Members sought to enforce a right that ran to their office, not to their person. “If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member’s seat, a seat which the Member holds ... as trustee for his constituents, not as a prerogative of personal power.” Ibid. We therefore held that the individual Members did “not have a sufficient ‘personal stake’ in th[e] dispute” to maintain their challenge. Id., at 830. See also Warth, supra, at 506 (denying standing where “the record is devoid of any indication” that the requested “relief would benefit petitioners”); Simon v. Eastern Ky. Welfare Rights Organization, 426 U. S. 26, 39, 42 (1976) (denying standing to plaintiffs who did not “stand to profit in some personal interest” because it was “purely speculative” whether the relief sought “would result in these respondents’ receiving the hospital services they desire” (emphasis added)).
The majority finds that respondents have a sufficient stake in this litigation because the substantive recovery will initially go to them, and “[w]hat does it matter what the ag *304 gregators do with the money afterward?” Ante, at 287. The majority’s assertion implies, incorrectly, that respondents have, or ever had, a choice of what to do with the recovery. It may be true that a plaintiff’s independent decision to pledge his recovery to another, as in respondents’ hypothetical of an “original owner of a claim who signs a collateral agreement with a charity obligating herself to donate every penny she recovers in [the] litigation,” Brief for Respondents 21, would not divest the plaintiff of Article III standing. But respondents never had the right to direct the disposition of the recovery; they have only the right to sue. The hypothetical plaintiff who chooses to pledge her recovery to charity, by contrast, will secure a personal benefit from the recovery. Unlike respondents’ claims, the hypothetical plaintiff’s pre-existing claim is not tied in any way to her separate agreement to direct her recovery to charity. She has more than the right to sue; she has the right to exercise her independent authority to direct the proceeds as she sees fit. In that situation, the Article III requirement that a plaintiff demonstrate a personal stake in the outcome of the litigation is satisfied.[2]
*305 The Court believes that these standing principles, embodying a “core component derived directly from the Constitution,” Allen, 468 U. S., at 751, that is of “particular importance in ensuring that the Federal Judiciary respects the proper — and properly limited — role of the courts in a democratic society,” and that is “crucial in maintaining the tripartite allocation of power set forth in the Constitution,” Cuno, 547 U. S., at 341 (internal quotation marks omitted), should yield “as a practical matter” to the prospect that a contrary “holding could easily be overcome,” ante, at 289. The Court chooses to elevate expediency above the strictures imposed by the Constitution. That is a tradeoff the Constitution does not allow. Cf. Raines, supra, at 820 (“[W]e must put aside the natural urge to proceed directly to the merits of this important dispute and to ’settle’ it for the sake of convenience and efficiency”). Perhaps it is true that a “dollar or two,” ante, at 289, would give respondents a sufficient stake in the litigation. Article III is worth a dollar. And in any case, the ease with which respondents can comply with the requirements of Article III is not a reason to abandon our precedents; it is a reason to adhere to them.
II
Given all this, it is understandable that the majority opts to minimize its reliance on modern standing principles and to retreat to a broad, generalized reading of the historical tradition of assignments. But that history does not support the majority’s conclusion.
*306 The first problem lies in identifying the relevant tradition. Much of the majority’s historical analysis focuses on the generic (and undisputed) point that common law and equity courts eventually permitted assignees to sue on their assigned claims. See ante, at 275-279. I would treat that point as settled as much by stare decisis, see Vermont Agency, 529 U. S., at 773, as by the historic practice of the King’s Bench and Chancery. But the general history of assignments says nothing about the particular aspect of suits brought on assigned claims that is relevant to this case: whether an assignee who has acquired the legal right to sue, but no right to any substantive recovery, can maintain an action in court. On that precise question, the historical sources are either nonexistent or equivocal.
A
None of the English common-law sources on which the majority relies establishes that assignments of this sort would be permitted either at law or in equity. As the majority’s discussion makes clear, both systems permitted suits brought on assignments — either in equity by an assignee having a beneficial interest in the litigation, or at law by an assignee who had a power of attorney and sued in the name of the assignor. See ante, at 276-277. But at all times, suits based on assignments remained subject to the prohibition on champerty and maintenance. See 7 W. Holdsworth, History of English Law 535-536 (1926).[3] By the 18th cen *307 tury, an assignment no longer constituted maintenance per se, see id., at 536, but it appears to have been an open question whether an assignment of the “[b]are [r]igh[t] to [litigate” would fail as “[s]avouring” of champerty and maintenance, see M. Smith, Law of Assignment: The Creation and Transfer of Choses in Action 318, 321 (2007). In order to sustain an assignment of the right to sue, the assignment had to include the transfer of a property interest to which the right of action was incident or subsidiary. Id., at 321-322; see also Prosser v. Edmonds, 1 Y. & C. Exch. 481, 160 Eng. Rep. 196 (1835); Dickinson v. Burrell, 35 Beav. 257, 55 Eng. Rep. 894 (1866); 2 J. Story, Commentaries on Equity Jurisprudence § 1040h, pp. 234-235 (8th ed. 1861); R. Megarry & R Baker, Snell’s Principles of Equity 82 (25th ed. 1960).
American courts as well understood the common-law rule to require a transfer of interest to the assignee — over and above the “naked right to bring a suit” — that gave the assignee a “valuable right of property.” Traer v. Clews, 115 U. S. 528, 541 (1885). A New York court, surveying the English sources, concluded that “an assignment to the plaintiff of the assignor’s right to maintain and prosecute an action for the specific performance of defendants’ agreement, amounts to nothing more than an assertion that the assignor has undertaken to assign to the plaintiff a bare right to litigate for the former’s benefit exclusively.” Williams v. Boyle, 1 Misc. 364, 367, 20 N. Y. S. 720, 722 (Ct. Common Pleas 1892). To secure standing in a court of equity, the court held, “it must appear that the assignee’s successful prosecution of the action is susceptible of personal enjoyment by him .. . .” Ibid, (emphasis added).
So while there is no doubt that at common law, courts of law and equity sought ways of protecting the rights of assignees, they did not do so to the exclusion of the age-long objection to maintenance, which could be found when the assignee lacked a sufficient interest in the subject matter of the litigation. During the common-law period at least, it re *308 mained an open question whether an assignee for collection, who by agreement took nothing from the suit, had a sufficient interest in the assigned debt to support his right to sue.
To be sure, the assignments at issue here purport to give respondents “all rights, title and interest” in the payphone operators’ claims for dial-around compensation. App. to Pet. for Cert. 114. But when severed from the right to retain any of the substantive recovery, it is not clear that common-law courts of law or equity would have treated the assigned right to litigate as incidental or subsidiary to the interest represented by the claim itself. Cf. 7 Holdsworth, supra, at 538 (“[I]t was not till certain classes of rights . . . became more freely, assignable in equity, that it became necessary to distinguish between the cases in which assignment was permitted and cases in which it was not; and it is for this reason that we find very little clear authority on these questions till quite modern times”).[4]
I do not take the majority’s point to be that the common-law tradition supplies the answer to this question. As the majority concedes, it was not until the 19th century that “courts began to consider the specific question presented here.” Ante, at 279. But even granting this starting point, the Court’s recitation of the 19th-century tradition fails to account for the deep divergence in practice regarding the right of assignees with no stake in the substantive recovery to maintain an action in court.
*309 The majority concedes that “some States during this period of time refused to recognize assignee-for-collection suits,” ante, at 281, but that refusal was substantially more widespread than the majority acknowledges. See Robbins v. Deverill, 20 Wis. 142 (1865); Bostwick v. Bryant, 113 Ind. 448, 16 N. E. 378 (1888); Moses v. Ingram, 99 Ala. 483,12 So. 374 (1893); Brown v. Ginn, 66 Ohio St. 316, 64 N. E. 123 (1902); Coombs v. Harford, 99 Me. 426, 59 A. 529 (1904); Martin v. Mask, 158 N. C. 436, 74 S. E. 343 (1912). These courts concluded that assignees having no legal or beneficial interest to vindicate could not sue on the assigned claims.
Several more States, including some enlisted by the majority, only eventually recognized the right of assignees for collection to sue after taking inconsistent positions on the issue. In fact, the rule regarding assignees for collection only was so unsettled that the Kansas Supreme Court reversed itself twice in the span of 19 years. Compare Krapp v. Eldridge, 33 Kan. 106, 5 P. 372 (1885) (assignees for collection only may sue as the real party in interest), with Stewart v. Price, 64 Kan. 191, 67 P. 553 (1902) (assignees for collection only may not sue), with Manley v. Park, 68 Kan. 400, 75 P. 557 (1904) (assignees for collection only may sue again). During this period, many other courts reversed course on the flinty problem posed by assignees for collection only. See Hoagland v. Van Etten, 23 Neb. 462, 36 N. W. 755 (1888), overruled by Archer v. Musick, 147 Neb. 1018, 25 N. W. 2d 908 (1947); State ex rel. Freebourn v. Merchants’ Credit Serv., Inc., 104 Mont. 76, 66 P. 2d 337 (1937), overruled by Rae v. Cameron, 112 Mont. 159, 114 P. 2d 1060 (1941).
The majority’s survey of 19th-century judicial practice thus ignores a substantial contrary tradition during this period. That tradition makes clear that state courts did not regularly “entertai[n] suits virtually identical to the litigation before us.” Ante, at 280. In reality, all that the majority’s cases show is that the question whether assignees for collection could maintain an action in court was hotly con *310 tested — a live issue that spawned much litigation and diverse published decisions. The confusion was much remarked on by courts of this period, even those that ultimately sided with the Court’s understanding of the prevailing practice. See, e. g., Gomer v. Stockdale, 5 Colo. App. 489, 492, 39 P. 355, 356 (1895) (“There is much controversy in the various states respecting that almost universal code provision, that a suit must be prosecuted in the name of the real party in interest”); Compton v. Atwell, 207 F.’2d 139, 140-141 (CADC 1953) (“[W]hether an assignee for collection only is the real party in interest... has produced a variance of judicial opinion” and “has so divided other courts”).
Commentators have also called attention to the divergent practice. As the majority notes, John Norton Pomeroy observed that “there is some conflict” on the question whether an assignee for collection obligated to “account for the whole proceeds ... is entitled to sue in his own name.” Remedies and Remedial Rights § 132, p. 159 (1876) (internal quotation marks omitted). See also Comment, The Real Party in Interest Rule Revitalized: Recognizing Defendant’s Interest in the Determination of Proper Parties Plaintiff, 55 Cal. L. Rev. 1452, 1475 (1967) (“Nowhere do the courts manifest more confusion than in deciding whether an assignee for collection only is a real party in interest”); Note, 51 Mich. L. Rev. 587, 588 (1953) (observing that “[t]here is, however, little agreement among the courts as to the meaning and purpose of [real party in interest] provisions” and noting that they have been construed “to prevent the owner of the bare legal title to a chose in action from suing”). Indeed, notable legal commentators of the period argued against permitting suits by assignees for collection. See, e. g., 1 J. Kerr, Law of Pleading and Practice § 586, pp. 791-792 (1919) (“[T]he party in whom the legal interest is vested is not always the real party in interest. The real party in interest’ is the party who would be benefited or injured by the judgment in the cause. . . . The rule should be restricted to parties whose interests are in issue, and are to be affected by the decree”).
*311 This unsettled and conflicting state of affairs is understandable given the transformation in the understanding of the common-law prohibition on suits by assignees with no beneficial interest. The immediate cause for this transformation was the merger of law and equity, and the creation of real party in interest provisions intended to reconcile the two forms of actions. Allen v. Brown, 44 N. Y. 228, 231 (1870) (noting that New York code provision allowing assignees to sue as the real party in interest “abolishe[d] the distinction between actions at law and suits in equity”); see ante, at 279. The fusion of law and equity forced courts to confront the novel question of what to do with assignees for collection only, who could not sue at law in their own name, and who could not recover on a bill in equity for the lack of any beneficial interest to enforce. Were such assignees, under the new system, real parties in interest who could bring suit? It is not surprising that courts took conflicting positions on this question, a question for which the historical tradition did not provide an answer. Given this, it is difficult to characterize a practice as showing what sort of cases and controversies were “traditionally amenable to . . . the judicial process,” Steel Co., 523 U. S., at 102 (emphasis added), when the practice was a self-conscious break in tradition.
In Vermont Agency, by contrast, the Court relied on a long and unbroken tradition of informer statutes that reached back to the 14th century and prevailed up to the “period immediately before and after the framing of the Constitution.” 529 U. S., at 776. The Court noted that the American Colonies “pass[ed] several informer statutes expressly authorizing qui tarn suits,” and that the First Congress itself “enacted a considerable number of informer statutes.” Ibid. This tradition provided relevant evidence of what the Framers in 1787 would have understood the terms “case” and “controversy” to mean. See Coleman v. Miller, 307 U. S. 433, 460 (1939) (opinion of Frankfurter, J.) (the Article III “[j]udicial power could come into play only in matters that were the traditional concern of the courts at West *312 minster and only if they arose in ways that to the expert feel of lawyers constituted ‘Cases’ or ‘Controversies’ ”).[5]
There is certainly no comparable tradition here. The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of Article III. Although we have sometimes looked to cases postdating the founding era as evidence of common-law traditions, we have never done so when the courts self-consciously confronted novel questions arising from a break in the received tradition, or where the practice of later courts was so divergent. A belated and equivocal tradition cannot fill in for the fundamental requirements of Article III where, as here, those requirements are so plainly lacking.
B
Nor do our own cases establish that we “long ago indicated that assignees for collection only can properly bring suit.” Ante, at 288. (If the majority truly believed that, one would expect the cases to be placed front and center in the Court’s analysis, rather than as an afterthought.) None addressed the requirements of Article III, and so none constitutes binding precedent. See Steel Co., supra, at 91 (“[D]rive-by jurisdictional rulings of this sort... have no precedential effect”); Lewis v. Casey, 518 U. S. 343, 352, n. 2 (1996) (“[W]e have repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect”).
*313 In Waite v. Santa Cruz, 184 U. S. 302 (1902), we addressed the then-existing statutory provision that barred jurisdiction over suits “improperly or collusively made or joined ... for the purpose of creating a case cognizable or removable under this act.” Id., at 325. We held that a plaintiff who took legal title of multiple bonds “for purposes of collection” could not satisfy the statute when the bonds individually did not meet the amount in controversy requirement. Ibid. The Court did not say that the “suit could properly be brought in federal court,” ante, at 283, if the only objection was the limitation placed on the plaintiff’s assignment; instead, the Court remarked that such a limited assignment would not violate the statutory prohibition on suits that are “improperly or collusively made or joined,” Waite, supra, at 325.
In Spiller v. Atchison, T. & S. F. R. Co., 253 U. S. 117 (1920), the plaintiff, secretary of the Cattle Raisers’ Association, sued to enforce an order of reparations issued by the Interstate Commerce Commission, which found that the defendant railroads had charged excessive shipping rates to the members of the association. The question before the Court was the validity of the lower court’s ruling that the assignments to the plaintiff—which reserved a beneficial interest in the assignors, the individual members of the association— did not vest legal title in the secretary “so as [to] authorize the Commission to make the award of damages in his name.” Id., at 134. We concluded that the agency was authorized to issue the reparations order in the name of the plaintiff because the assignments were “absolute in form.” Ibid. We then concluded that “beneficial or equitable title” was not necessary for the plaintiff “to claim an award of reparation” and enforce that award in his own name in court. Ibid. In other words, the Court addressed merely the question whether it was appropriate for a federal agency (not bound by the constraints of Article III) to enter an award in the plaintiff’s name. In no way did the Court endorse the right *314 of an assignee for collection to sue as an initial matter in federal court.
Nor did the Court address Article III standing requirements in Titus v. Wallick, 306 U. S. 282 (1939). There, we found that an assignment “for purposes of suit,” where the assignee had an obligation to account for the proceeds (in part) to another, did not render the assignment invalid under New York state law. Id., at 289. Thus, we held that the Ohio courts had failed to give full faith and credit to an earlier, valid New York court judgment. Id., at 292. If we had been presented with the Article III question, we would likely have found it significant that the plaintiff-assignee stood to take the balance of any recovery after the proceeds were used to discharge the debts of the assignor (plaintiff’s brother) and the plaintiff’s wife. Id., at 286. But in any event, the Court’s conclusion that the assignment was valid under New York law, where the restrictions of Article III do not operate, does not support the view that suits by assignees for collection are permissible in federal courts.
C
When we have looked to history to confirm our own Article III jurisdiction, we have relied on a firmly entrenched historical tradition that served to confirm the application of modern standing principles. See Vermont Agency, 529 U. S., at 774-778. The Court’s decision today illustrates the converse approach. It relies on an equivocal and contradictory tradition to override the clear application of the case-or-controversy requirement that would otherwise bar respondents’ suit.
But perhaps we should heed the counsels of hope rather than despair. The majority, after all, purports to comply with our Article III precedents, see ante, at 285-287, so those precedents at least live to give meaning to “the judiciary’s proper role in our system of government” another day, Raines, 521 U. S., at 818 (internal quotation marks omitted). *315 What is more, the majority expressly and repeatedly grounds its finding of standing on its conclusion that “history and precedent are clear” that these types of suits “have long been permitted,” ante, at 275, and that there is “a strong tradition” of such suits “during the past two centuries,” ante, at 285, 288. This conclusion is, for the reasons we have set forth, achingly wrong — but at least the articulated test is clear and daunting.
Finally, there is the majority’s point that all this fuss could have been avoided for a dollar, see ante, at 289 — a price, by this point, that most readers would probably be happy to contribute. The price will be higher in future standing cases. And when it is — when standing really matters — it would be surprising if the Court were to look to a case in which it did not.
I would vacate the decision of the Court of Appeals and remand for further proceedings.

 Because respondents have failed to demonstrate that they have Article III standing to bring their claims, I do not reach the question whether prudential considerations would also bar their suit.

The majority believes that the examples of trustees, guardians ad litem, receivers, and executors show that “federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit.” Ante, at 287. None of these examples is pertinent to the question here. “A guardian ad litem or next friend ... is a nominal party only; the ward is the real party in interest . . . .” 6A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1548, pp. 373-374 (2d ed. 1990). A receiver “is considered to be an officer of the court, and therefore not an agent of the parties, whose appointment is incident to other proceedings in which some form of primary relief is sought.” 12 id., §2981, at 9-10 (2d ed. 1997) (footnote omitted). Trustees hold legal title to the assets in the trust estate and have an independent fiduciary obligation to sue to preserve those assets. The trustee’s discharge of its legal obligation is an independent, personal benefit that supports the trustee’s standing to sue in federal court. The majority’s response that assignees for collection only have a “contractual obligation to litigate,” ante, at 288, is unavailing, because the contractual obligation to sue and remit the proceeds of any recovery was a condition of the assign *305 ment of the claim in the first place. The majority’s reasoning is perfectly circular: A suit pursuant to a contract to remit proceeds satisfies Article III because there is a contract to remit proceeds.
In any event, the majority cannot dispute the point that suits by trustees, guardians ad litem, executors, and the like make up a settled, continuous practice “of the sort traditionally amenable to, and resolved by, the judicial process.” Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 102 (1998). As shown below, the same cannot be said for suits by assignees for collection only. See infra, at 309-312.

 Blaekstone defined maintenance as the “officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it____ This is an offence against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression.” 4 W. Blaekstone, Commentaries *134-*135. Champerty “is a species of maintenance, . . . being a bargain with a plaintiff or defendant campum partite, to divide the land or other matter sued for between them, if they prevail at law; whereupon the champertor is to carry on the party’s suit at his own expense.” Id., at *135.

 The fact that a bankrupt assignor could sue at law to recover debts for the benefit of an assignee creditor, see ante, at 277 (citing Winch v. Keeley, 1 T. R. 619, 99 Eng. Rep. 1284 (K. B. 1787)), says nothing about the issue in this case. It is of course true that one has standing to sue when the result of a favorable judgment will be the discharge of a debt or other legal obligation. The only legal obligation respondents seek to discharge is the obligation to remit the proceeds of the litigation to the payphone operators. But as explained above, a party lacking the independent right to direct the disposition of the proceeds cannot demonstrate the personal stake required to invoke the authority of an Article III court. See supra, at 304.

 The statutes from the American Colonies add nothing to the majority’s historical argument. See ante, at 278-279. Exceptions (some created by statute) to the general rule against assignments at law arose early in the common-law period, including exceptions for executors and administrators of estates, assignees in bankruptcy, negotiable instruments, and assignments involving the sovereign. See 29 R. Lord, Williston on Contracts § 74:2, pp. 214-215 (4th ed. 2003). What none of these exceptions provides for, however, are suits brought by assignees for collection only — i. e., assignees who have no share in the substantive recovery. Such assignees, as the majority acknowledges, did not attract the attention of courts until the 19th century. See ante, at 279.