UNITED STATES *v.* TOLEDO MUSEUM OF ART (No. 4089)[1]

United States Court of Customs and Patent Appeals, February 28, 1938

*Joseph R. Jackson,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney, and *James F. Donnelly,* junior attorney, of counsel), for the United States.

*Robert H. Jamison* and *Tyler, Wilson & Rhinefort* (*Justice Wilson* and *Joseph A. Guimond* of counsel) for appellee.

[1] T. D. 49455.

[Oral argument February 8, 1938, by Mr. FitzGibbon and Mr. Jamison]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges [1]

LENROOT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, sustaining two protests of appellee insofar as they related to certain items described in the invoices covered by the entries, and specified in the judgment.

The merchandise involved consists of Japanese paintings in water colors, imported from Japan by appellee in 1931.

The record shows that there were 107 paintings imported, and all of them were entered by appellee under paragraph 1809 of the Tariff Act of 1930; a bond was given by appellee in compliance with the provisions of said paragraph.

After importation and entry, twenty-one of said paintings were sold in the United States, and the collector assessed "liquidated damages" with respect to those paintings which were sold, as provided in the bond, in the amount of duties chargeable under paragraph 1547 of said tariff act. The paragraphs of the said tariff act, insofar as they are here pertinent, read as follows:

PAR. 1809. Works of art, collections in illustration of the progress of the arts, sciences, agriculture, or manufactures, photographs, works in terra cotta, parian, pottery, or porcelain, antiquities and artistic copies thereof in metal or other material, imported in good faith for exhibition at a fixed place by any State or by any society or institution established for the encouragement of the arts, science, agriculture, or education, or for a municipal corporation, and all like articles imported in good faith by any society or association, or for a municipal corporation, for the purpose of erecting a public monument, and not intended for sale nor for any other purpose than herein expressed; but bond shall be given, under such rules and regulations as the Secretary of the Treasury may prescribe, for the payment of lawful duties which may accrue should any of the articles aforesaid be sold, transferred, or used contrary to this provision, and such articles shall be subject at any time to examination and inspection by the proper officers of the customs   *   *   *.

PAR. 1807. Original paintings in oil, mineral, water, or other colors, pastels, original drawings and sketches in pen, ink, pencil, or water colors, artists' proof etchings unbound, and engravings and woodcuts unbound, original sculptures or statuary, including not more than two replicas or reproductions of the same; *   *   *.

PAR. 1547. (a) Works of art, including (1) paintings in oil, or water colors pastels, pen and ink drawings, and copies, replicas, or reproductions of any of the same,   *   *   *   not specially provided for, 20 per centum ad valorem.

Appellee filed two protests against said liquidations, claiming the paintings were free of duty under said paragraph 1809, or, in the alternative, free of duty as original paintings under paragraph 1807. The protests were consolidated by the Customs Court for purposes of trial.

---

[1] JACKSON, Judge, took no part in the consideration or decision of this case.

In the decision of the trial court there is some discussion as to whether the liquidation of the collector should be regarded as determining merely the question of the penalty to be imposed for violation of the terms of the bond, in which case the court would be without jurisdiction, or as a liquidation of duties assessable against the paintings. The court held that the latter was the correct view to be taken, and took jurisdiction of the case.

We agree with this holding of the trial court and its reasons given therefor, and, inasmuch as the Government raises no question upon this point, we find it unnecessary to discuss it.

Two witnesses testified in behalf of appellee, and certain documentary evidence was introduced. One witness testified in behalf of the Government, and the Government also introduced certain documentary evidence.

It appears from the record that the said 107 paintings were imported primarily for exhibition purposes; that in addition to being exhibited in the city of Toledo, they were exhibited in several other cities in the United States; that the Japanese Government shared equally with appellee in the expenses incident to the exhibition, and that the object of the importation of the paintings was primarily cultural, no admission fee being charged in connection with their exhibition; but, as hereinbefore stated, twenty-one of the paintings were sold.

The only seriously contested issue before the trial court was upon the question of the originality of the twenty-one paintings here involved, and it is only to this issue that the Government's assignments of error are directed. The trial court, Judge Evans dissenting, held that the proof established that twenty of said paintings were original works of art, entitled to free entry under paragraph 1807, but that one of the paintings sold, identified as Item 26 in Exhibit 7, was a screen and, as an article of utility, was not classifiable under the provisions of paragraph 1807. As to this item, the protest covering the same was specifically overruled.

J. A. MacLean, a witness on behalf of appellee, testified that he was curator of the Toledo Museum of Art, and was such at the time of the importation of the involved paintings. He testified that, as a young man, he began his career at the Boston Institute of Fine Arts, was curator at the Cleveland Museum of Art for ten years, later went to the Art Institute at Chicago, then became curator of the Toledo Museum of Art, and that his particular subject is Oriental art.

With respect to the particular paintings imported from Japan, including those here involved, the witness testified in part as follows:

Q. Tell the court your work in connection with it, the method of assembling it, the financing of it, etc.—A. It was because of my interest in contemporary art. It is all modern art. There is a good deal of that kind of European and

American art, and being curator of Oriental art I wanted an exhibition of contemporary art of the Orient and Japan. With that in mind I went ahead with as much advice as I could get as to what I should do to create a contemporary exhibition of this character. The museum agreed to finance it in part and the Japanese Government agreed to finance it equally with us, half and half of the expenses. With that in mind we went ahead and arranged the exhibition at a time when we felt it was of interest not only to us in Toledo where we initiated the exhibition but we wanted it to be of interest to the people of America as a good will gesture at that time, in 1933, particularly as a good will gesture, at that time. * * * There were 107 paintings of the active, premier artists of Japan of the period. It was rather an expensive thing in spite of the fact the Japanese Government had agreed to pay half the expenses, and when this extra fee came along, naturally we tried to see what could be done about it because of the circumstances of the whole exhibition.

Q. Was there an admission charge for this exhibition?—A. No.

Q. It was purely for cultural purposes?—A. It was purely for cultural purposes. As I said before, it was primarily because of my interest in contemporary art of the Orient and Japan which I felt should be brought to the interest of the people of America, just as well as American and European contemporary art is.

　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*　　　　*

Q. You personally examined all the pictures in this exhibition?—A. Yes; I know all the work of the men.

Q. And familiar with the twenty-one paintings that are in question here?—A. Yes.

Q. Can you as an expert state that they are contemporary fine art?—A. Yes, positively; I think there is no question about it.

Q. From your examination of those pictures would you say they are original works of the artists as indicated on them?

Mr. KAVANAGH. That is objected to. How can anybody tell that?

Judge TILSON. Overruled; let it go on the record.

Mr. KAVANAGH. Exception.

—A. Yes. They were all signed as the work of the individual artist—just as we study a Benson or a Gaugain or anybody else in American or European art. * * *

Mr. GUIMOND. We have been only able to gather one of the twenty-one paintings that are the subject of these protests, and we would like to offer it in evidence.

Judge TILSON. Can the witness testify that this is one of the original paintings in that exhibition?

Mr. GUIMOND. I intend to so show.

By Mr. GUIMOND:

Q. Mr. MacLean, can you identify that as one of the paintings that was exhibited in that exhibition?

Mr. KAVANAGH. May I interpose an objection at this point? I respectfully object to any testimony being offered as to the artistic merits of the picture on the ground that they made entry under paragraph 1809, which calls for works of art for exhibition purposes, and they did not make entry under paragraph 1807 which would be the paragraph under which the merchandise might be admitted free if it were a work of art. Therefore, not having entered under paragraph 1807 and not being entitled to enter under paragraph 1809 because they did not comply with the regulations, in that they did not furnish the necessary affidavits, I respectfully submit any testimony as to artistic merit is out of order.

Judge TILSON. You can take an exception. I will let it come in.

Mr. KAVANAGH. Exception.

By Mr. GUIMOND:

Q. Can you identify that as one of the paintings that was in this exhibition?—A. Yes; that is one of the paintings. * * *

Mr. GUIMOND. We offer that picture in evidence and we will produce it again if it is needed in the future. We, naturally, do not want to leave it here.

Judge TILSON. Have you a photograph of it?

By Mr. GUIMOND:

Q. Can you substitute a photograph for this original?—A. Yes; we have photographs of all of these.

Judge TILSON. The court will allow this to come in as Exhibit 1, and later you will substitute a proper photograph for it and withdraw the painting itself.

\*      \*      \*      \*      \*      \*      \*

By Mr. GUIMOND:

Q. Mr. MacLean, can you identify this photograph as an example of Japanese free fine art?—A. Yes; it is in the regular medium of Japanese art, water-colors and not oil. It is the traditional medium that the Japanese use, not only the Japanese but also the Chinese use it. Water-colors are used as the ordinary medium rather than oil. All paintings are done in water-colors. It is the very highest type of fine art of Japan or China.

Judge TILSON. Do you know the name of the artist who did this?

The WITNESS. This particular painting is by Koha. It is in our illustrative catalogue with the actual artist's name.

Mr. KAVANAGH. It is Number 17.

Mr. GUIMOND. We would like to submit this photograph as a substitute for the original painting.

Judge TILSON. The Government will object to it, but I am going to let it come in.

Mr. KAVANAGH. I will agree this is a photograph of the paintings, but I will not agree to its admissibility. I do not challenge the fact it is a photograph of it.

Judge TILSON. Let it be marked.

Mr. KAVANAGH. Exception.

(The photograph (Figure 17 of catalogue) substituted for the original painting was received and marked "Exhibit 1, Protests 649035–G, etc.", of this date.)

By Mr. GUIMOND:

Q. Mr. MacLean, these artists to your personal knowledge are all ranking artists of Japan?

Mr. KAVANAGH. I object to the question. It is leading.

Judge TILSON. Overruled.

Mr. KAVANAGH. Exception.

—A. Yes; they all are. They were chosen for us for this exhibition, and many of the paintings were painted for this exhibition knowing they were to be shown in Toledo with the hope we could circuit them to other museums so the public could see the type of art of the contemporary painters of Japan. Such a man as Taikwan, who is a ranking artist in Japan, including two paintings in this exhibition and Seiho, who like Taikwan, has a high place in Japan among artists, also included paintings in this exhibition. The Japanese Government was anxious that it should be a representative exhibition of contemporary art in Japan. That was the plan.

By Mr. GUIMOND:

Q. Mr. MacLean, were all the paintings that remained in this country in addition to the ones that were exported, in your opinion, free fine art?—A. Yes. If there is such a thing in American and European art, certainly they are representatives of Japanese fine art.

Q. Is this Exhibit 1 which we have produced similar to the other twenty paintings?

Mr. KAVANAGH. That is objected to. How can you judge the others from this one?

Judge TILSON. Overruled.

Mr. KAVANAGH. Exception.

—A. Yes; all were of a high type of contemporary painting.

By Mr. GUIMOND:

Q. Can you also state whether, in addition to this one, the remaining twenty were all original paintings?

Mr. KAVANAGH. That is objected to.

Judge TILSON. Overruled.

Mr. KAVANAGH. Exception.

—A. All of them were; yes. I might say they were all high class because certain museums, several museums, in America have gotten pictures from this exhibition. We, ourselves, bought one by Taikwan. The Boston Museum have bought one. They have the finest collection of Oriental art, a better collection of Oriental art in any one group. The Museum at Dayton bought one; the Roerich Museum bought two or three. Several of these have gone into museum collections because the art was of that quality.

The only cross-examination of the witness by the Special Attorney for the Government, with respect to the question of whether or not the involved paintings were originals, is as follows:

X Q. You never saw any of these pictures painted, yourself?—A. These, many times.

X Q. These imported articles you saw painted?—A. No. I thought you said paintings of this sort.

X Q. No; I said these.—A. No.

Upon the subject of the disposition of the proceeds of the sale of the paintings in issue, the witness upon cross-examination testified as follows:

X Q. Now, Mr. MacLean, you testified, you admitted, that the Toledo Museum of Art published a catalogue in connection with the exhibition of these Japanese pictures; right?—A. Yes.

X Q. On page six thereof in italics at the bottom of the page is this paragraph. I will show it to you so you can refresh your recollection. It reads: "It is hoped that some of these beautiful examples of Japanese pictorial art may be added to Toledo homes. The prices are available upon request and are, in many instances, well within the means of those who desire to purchase." That is a statement published in there with your approval?—A. Yes, sir; I referred to that before.

\* \* \* \* \* \* \*

X Q. Did the Toledo Museum of Art get any commission on the sales of these pictures?—A. None; no.

X Q. Who was the money paid to?—A. Paid to the artist direct.

X Q. You know that of your own knowledge?—A. Yes.

X Q. Did you sell the whole twenty-one?—A. No.

X Q. How do you know of your own knowledge, then, the artist was paid for the picture?—A. We kept in touch with all matters at our Toledo office. We had to be responsible for the exhibition and we kept track of all the business that took place.

X Q. The money for these pictures was transmitted through the Toledo Museum to the artist?—A. It was sent to us and we sent it to the artist.

One Howard C. Hollis, a witness in behalf of appellee, testified that he was the curator of Oriental art of the Cleveland Museum of Art,

and had been such since 1921; that he graduated from the Fine Arts Department of Harvard University; that he studied Chinese art for three and one-half years in China, had since that time visited the Orient once, and had been to Europe three times in the pursuance of Oriental art; and that, before coming to Cleveland, he was connected with the Fogg Museum at Harvard University. He further testified as follows:

Q. Can you identify this as one of the original paintings we had at the Toledo exhibition?—A. Not absolutely; I think it was. It looks like one. I know that artist. But I cannot be sure it was one in that exhibition.

Q. You saw all the paintings in that exhibition?—A. I was at the exhibition when it was at Toledo.

Q. From your observation of this painting, would you testify that was Japanese fine art?—A. Certainly; yes.

Q. In your opinion as an expert, were those original paintings by the individual Japanese artists who supplied them?—A. Yes. I never got close to them to examine them, but I saw no reason to doubt that they were.

Q. Would a closer examination of this permit you to identify it as an example of Japanese fine art?—A. Yes, but not necessarily by the man because I am not sufficiently familiar with that work.

Q. You mean whether it is a reproduction or an original? (The witness leaves the witness stand and examines the painting, Exhibit 1.)—A. It is an original unquestionably.

Q. Is that as a picture an example of the Japanese art that was exhibited at the Toledo Museum during the course of this exhibition?—A. Is that an example of the type?

Q. Yes.—A. Yes; it is.

Mr. GUIMOND. That is all.

Mr. KAVANAGH. No questions.

The Government made no objection to the competency of the witness to testify upon the question of the originality of the involved paintings.

The appellant offered no testimony upon the question of the originality of the paintings, but did offer in evidence, during the cross-examination of Mr. MacLean, a catalog issued by appellee, and referred to by said MacLean in his testimony hereinbefore quoted. This offer appears in the record as follows:

Mr. KAVANAGH. * * * I have a catalog here which the Assistant Collector has brought in. I think it is the same as the one already in evidence. I don't see any reason for duplicating it, but I will ask that this Exhibit 1, besides including picture Number 17, that it include the whole book.

Mr. GUIMOND. No objection.

Judge TILSON. So ordered.

(The catalog referred to was received and marked "Exhibit 1, Protests 649035–G, etc.," of this date.)

This catalog is entitled "TOLEDO—JAPAN PAINTING EXHIBITION," and was published by the Toledo Museum of Art. Its preface narrates the events leading up to the importation of the 107 paintings,

a general description of the paintings, and the different schools to which they belong.

In the catalog each painting is numbered, following which appears the title and the name of the artist. Immediately below is a short description of the painting, and biographical data concerning the painter, and the back part of the catalog contains photographs of of the paintings, identified by number.

The question is whether, in view of this record, the finding of the trial court with respect to originality of the paintings is clearly contrary to the weight of the evidence. The Government cites several cases, decided by the same division of the Customs Court that decided the case at bar, which it urges are contrary in principle to the conclusion reached by the trial court in this case. Suffice it to say that in none of the cases relied upon by the Government were the facts similar to the facts in the instant case.

The Government contends that the competency of the witness MacLean to testify upon the question of the originality of the paintings is not shown in the record. In its brief the Government states:

It will be noted that Government counsel objected to this line of testimony, because the witness had not testified how he knew the paintings were original conceptions of the artists. An analysis of this testimony shows that the witness is a student of Oriental art and examined all the pictures in the exhibition and knows all the work of the men; as an expert he testified that they are free fine art, *and because they are signed as the work of the individual artist they are original paintings.*

We find no such objection in the record. That both of appellee's witnesses were qualified to testify upon the general subject of works of art is clearly established. When the witness MacLean was asked whether the paintings were original works of the artists as indicated thereon, the Special Attorney for the Government made the following objection: "That is objected to. How can anybody tell that?"

Obviously, this general objection did not go to the competency of the witness to testify upon the subject of the originality of the paintings. The thought conveyed by the objection is, rather, that proof of originality of the paintings was impossible, which of course could not be agreed to.

The general rule is that a general objection to evidence, without definitely and specifically stating the grounds upon which it is based, is insufficient. Vol. 64, Corpus Juris, section 203.

At a later point in the examination of the witness, the question was again asked on direct examination whether the paintings were original. To this question the Special Attorney stated: "That is objected to," without giving any specific ground of objection.

As already stated, there was no cross-examination of the witness MacLean on the subject of originality of the paintings other than to ask him if he saw the pictures painted, to which the witness responded

that he did not. It is possible that, if the witness had been cross-examined as to how his opinion was formed that the paintings were originals, it might have developed that his statement that they were originals should not have any probative force; but this was not done.

With regard to the witness Hollis, there was not even a general objection to the questions asked him on direct examination as to the originality of the paintings, and there was no cross-examination by the Government.

Furthermore, with regard to the facts in the case, we would observe that the catalog hereinbefore referred to was introduced by the Government, without restrictions, and it is a part of the evidence in the case. True, insofar as it refers to the character of the paintings and the identity of the artists who painted them, such evidence is in the nature of hearsay, but upon this record it may nevertheless be considered.

The rule is that hearsay evidence, admitted without objection, is to be considered and given its natural probative effect, as if it were in law admissible. *Diaz* v. *United States*, 223 U. S. 442; *Spiller* v. *Atchison, Topeka & Santa Fe Railway Company*, 253 U. S. 117.

Taking the record as a whole, we are not convinced that the decision of the trial court is clearly contrary to the weight of the evidence. We think the matter contained in said catalog tends to corroborate the evidence of the witnesses that the pictures in question are original paintings.

It may be that the testimony of the witnesses upon the question of originality of the paintings could have been greatly weakened by timely and specific objections, and by cross-examination, but upon the record before us we find no reversible error in the decision of the trial court, and the judgment appealed from is *affirmed*.