**EASTERN CARRIER CORPORATION v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).**
No. 234.

District Court, M. D. Pennsylvania.
June 25, 1939.

Wm. B. Landis, of Scranton, Pa., and Lenahan, Fahey & Casper, of Wilkes Barre, Pa., for plaintiff.

Frank Coleman and Elmer B. Collins, Sp. Assts. to the Atty. Gen., and Thurman Arnold, Asst. Atty. Gen., for the government.

Daniel W. Knowlton, Chief Counsel, and P. J. Farrell, Asst. Chief Counsel, both of Washington, D. C., for Interstate Commerce Commission.

Before BIGGS and JONES, Circuit Judges, and WATSON, District Judge.

BIGGS, Circuit Judge.

The plaintiff, Eastern Carrier Corporation, a New Jersey corporation, successor in interest to A. Blackmore Transfer Company, Inc., has sued to set aside and annul that portion of an order of the Interstate Commerce Commission dated May 12, 1939,

which refused the application of plaintiff's corporate predecessor, A. Blackmore Transfer Company, Inc.,[1] for a certificate of public convenience and necessity under Section 206(a) of the Motor Carrier Act, 1935, Act of August 9, 1935, 49 Stat. 543, 551 (49 U.S.C.A. § 306(a). This court has jurisdiction of the cause pursuant to the provisions of the Act of October 22, 1913 (28 U.S.C.A. §§ 45, 45a). Our power to set aside and annul an order of the Commission, denying a certificate of public convenience and necessity under the Motor Carrier Act, is not challenged. See United States v. Maher, 307 U.S. 148, 152, 59 S.Ct. 768, 83 L.Ed. 1162.

Briefly, the facts are as follows. The plaintiff's predecessor corporation filed an application with the Commission for a certificate of public convenience and necessity to operate as a common carrier by motor vehicle in interstate commerce for the carrying of general merchandise over certain routes described in detail in its application. These routes may be divided into two groups, seven interstate routes on the one hand with respect to which the Commission granted the application, and three routes between terminii within Pennsylvania.[2] As to the latter the application was denied. The Commission also found the plaintiff was entitled to transport as a common carrier silk, rayon and commodities used by silk and rayon textile plants between certain terminii on the interstate routes, and hosiery from Washington to Philadelphia, but denied it the right to transport other commodities upon the ground that the transportation of such other commodities by the plaintiff and its corporate predecessor had been more or less sporadic and not continuous since June 1, 1935.

The plaintiff insisted that it was entitled to the certificate over all the routes named in its application by virtue of the so-called "grandfather" proviso of Section 206(a) of the Motor Carrier Act of 1935. This provides that the Commission shall issue a certificate without requiring further proof that public convenience and necessity will be served by an operation if the "carrier or predecessor in interest was in bona fide operation as a common carrier by motor vehicle on June 1, 1935, over the route or routes or within the territory for which application is made and has so operated since that time * * * except * * * as to interruptions of service over which the applicant or its predecessor in interest had no control * * *". The Commission found as a fact that the operations over routes 7, 8 and 9 were not "bona fide interstate operations" within the purview of this language, and that therefore plaintiff was not entitled to the benefits of the grandfather clause of the Motor Carrier Act.

The facts upon which the Commission based its findings appear from the record

---

[1] The operations considered by the Commission were conducted throughout the period in question by the same parties in interest, members of a family named Blackmore, in different guises. Prior to 1934 the business was carried on by Arnold M. Blackmore, doing business as A. Blackmore Transportation Company, and his brother Albert H. Blackmore, doing business as A. Blackmore Transfer Company. In December, 1933, there was incorporated under the laws of Pennsylvania the A. Blackmore Transfer Company, Inc. This company made the application to the Commission, now drawn into this controversy, on February 11, 1936. On July 1, 1936, the plaintiff, Eastern Carrier Corporation, a corporation of the State of New Jersey, replaced the Pennsylvania corporation and the operations of the plaintiff Eastern Carrier Corporation commenced upon this date. The Commission authorized the substitution of the plaintiff Eastern Carrier Corporation for the applicant A. Blackmore Transfer Company, Inc., on July 15, 1936. The answers of the Interstate Commerce Commission and the United States admit that for the purposes of the suit the Eastern Carrier Corporation is the successor in interest to the A. Blackmore Transfer Company, Inc.

[2] Route 7, between Nanticoke and West Nanticoke, on the one hand, and Philadelphia, on the other. Nanticoke and West Nanticoke to Bridgeville as described in route 1; and from Bridgeville to Philadelphia as described in route 2 above.

Route 8, between Scranton, on the one hand, and Allentown and Bethlehem, on the other. Scranton to Bridgeville as described in route 1 above; Bridgeville to Allentown and Bethlehem as described in route 3 above.

Route 9, between Doylestown, Pa., and Willow Grove; Doylestown to Montgomeryville, Pa., over U. S. Highway 202; Montgomeryville to Lansdale, Pa., over U. S. Highway 202, and Pennsylvania Highway 63; and Lansdale to Willow Grove over Pennsylvania Highway 63.

as follows: On May 26, 1930, the Public Service Commission of the Commonwealth of Pennsylvania fined Arnold M. Blackmore, doing business as A. Blackmore Transportation Company, the sum of $500 for operating without a certificate of public convenience and necessity. On March 7, 1932, he was ordered to cease and desist from transporting merchandise between points in Pennsylvania because he had violated the terms of a certificate of public convenience and necessity which had been issued to him by the Pennsylvania Public Service Commission. Thereafter he continued to haul freight between Pennsylvania terminii, having changed the routes which his trucks pursued. Formerly his vehicles had made use of all Pennsylvania routes, but after the issuance of the cease and desist order the merchandise was hauled across the Delaware River at Easton, Pennsylvania, to Hackettstown, in New Jersey, where his brother, Albert H. Blackmore, doing business as A. Blackmore Transfer Company, picked up the freight left by the A. Blackmore Transportation Company's trucks and carried it back into Pennsylvania at Easton and thence to its destinations in Pennsylvania. Shipments in the reverse direction were transported to Hackettstown by Albert H. Blackmore and were there picked up by Arnold M. Blackmore. The Pennsylvania Public Service Commission found that the movement of traffic by the Blackmore trucks via Hackettstown in New Jersey was a mere subterfuge to give an interstate color to carriage which was essentially intrastate. It issued another cease and desist order and again fined Arnold M. Blackmore for the transactions referred to.

Within a short time thereafter the A. Blackmore Transportation Company, Inc., a corporation of the state of Pennsylvania, took over and conducted the operations of both the A. Blackmore Transportation Company and the A. Blackmore Transfer Company. This company operated over routes that passed into New Jersey and out again into Pennsylvania instead of over the all Pennsylvania routes formerly used. One Scranton-Philadelphia route passed through Stroudsburg, Pennsylvania, and crossing the Delaware River at Portland, Pennsylvania, went through Hackettstown and Washington, New Jersey, and then back across the Delaware River and into Pennsylvania at Easton. The other route pursued a similar course, except that it passed through Belvidere, New Jersey, instead of through Hackettstown and Washington, New Jersey. Traffic between the Allentown-Bethlehem and Scranton districts was routed through Easton to Hackettstown and out of New Jersey and back into Pennsylvania through Easton. After these operations had been carried on for a period of nearly a year the Public Service Commission of the Commonwealth of Pennsylvania found that these operations were intrastate in their essential character and fined A. Blackmore Transportation Company, Inc., for violating the Public Service Company Law of Pennsylvania (66 P.S. § 1 et seq.) and issued a cease and desist order against the company and against the several Blackmores. An appeal was taken to the Superior Court of Pennsylvania, which sustained the decision of the Public Service Commission, as will appear upon an examination of the opinion in Blackmore v. Public Service Commission, 120. Pa.Super. 437, 183 A. 115. The Supreme Court of Pennsylvania refused an appeal, and an attempt to litigate the matter further in the federal courts failed in the first instance by the action of this court, 12 F.Supp. 751. An appeal lodged in the Supreme Court was dismissed upon motion of the Commission, 299 U.S. 617, 57 S.Ct. 757, 81 L.Ed. 455.

Later Hackettstown, Washington and Belvidere, New Jersey, were abandoned as transfer points and in lieu thereof a garage and facilities for transfer was established at Bridgeville, New Jersey. Hackettstown is approximately twenty-five miles and Bridgeville about five miles from the Pennsylvania border. In respect to this change the Commission stated that "The fact that a terminal has now been erected at Bridgeville and the routes have been shortened by using that as a transfer point instead of Hackettstown does not give the color of genuineness to operations which, from their very inception, were fraudulent." It thereupon proceeded to deny the application for the certificate of public convenience and necessity over routes numbered 7, 8 and 9.

As to the Denial of a Certificate of Public Convenience and Necessity to the Plaintiff to Operate over Routes 7, 8 and 9.

An examination of the record before the Commission convinces us that there is no lack of substantial evidence to support the Commission's finding that the routing into and out of New Jersey in the conduct of the Pennsylvania terminii oper-

ations prior to June 1, 1935, the grandfather date, was indulged in to evade the jurisdiction of the Pennsylvania Public Service Commission. As has been repeatedly stated by the Supreme Court, the determination of the weight of the evidence presented is for the Commission. Virginia R. Co. v. United States, 272 U.S. 658, 663, 666, 47 S.Ct. 222, 71 L.Ed. 463; Western Paper Makers' Chemical Company v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941; Assigned Car Cases, 274 U.S. 564, 580, 47 S.Ct. 727, 71 L.Ed. 1204. We state, however, that upon the record which was before it we cannot see how the Commission could have reached any other conclusion than that the three routes having Pennsylvania terminii operated by the plaintiff and its predecessors, viz., 7, 8 and 9, were operated by them to the end that intrastate movements of traffic might be made to seem to be interstate transportation. The plaintiff contends that this conclusion cannot be supported because there were other reasons for adopting the Bridgeville route, viz., better weather conditions and an available connection with the route from New York City, but we would not conclude that these were the reasons why the transfer was established first at Hackettstown and then at Bridgeville in New Jersey.

The plaintiff goes further, however, and takes the position that even if the finding of the Interstate Commerce Commission is correct that the re-routing through New Jersey was for the purpose of evading the jurisdiction of the Pennsylvania Public Service Commission, this in itself does not render the transportation a non bona fide service in interstate commerce within the purview of the grandfather clause. The plaintiff points out that there is no allegation or proof that these Pennsylvania terminii services through Hackettstown and later through Bridgeville were conducted secretly or by misrepresentation or by any means calculated to mislead the authorities of the State of Pennsylvania. The plaintiff concedes that had these operations been performed secretly or by misrepresentations intended to deceive the authorities of the state of Pennsylvania that such was common carriage, then these operations would not have been bona fide. The plaintiff states that it has always taken the public position that the operations upon the Pennsylvania terminii route were interstate commerce and that therefore it is entitled to the benefit of the grandfather clause.

It is obvious that if a carrier by motor vehicle transports commodities across state lines it is engaged in interstate commerce. Any such transportation is subject to the commerce power of Congress, whether the motive be to evade the orders of a state commission or not. But for the plaintiff to avail itself of the benefits of the grandfather clause, its engagement, or that of its predecessor in interstate commerce prior to June 1, 1935, must have been bona fide within the purview of the statute. We think that it is obvious that the intention of Congress in conferring rights under the grandfather clause to carriers who had been engaged in bona fide interstate operations was predicated on the idea that the existence of bona fide operations across state lines served to raise a presumption that such operations aided convenience and were therefore a public necessity. Thus it may not be concluded that because a carrier transports merchandise across a state line in order to evade the orders of a state public service commission, it has thereby engaged in bona fide interstate commerce serving public convenience and necessity. Upon the contrary, the purpose which the carrier has served by such operation is a purely private purpose, the evasion of the laws of a state.

The definition sought to be applied by the plaintiff for the phrase "bona fide operation" is one which cannot be supported with any show of reason. This clearly appears from the authority which the plaintiff itself cites in Slagle Contract Carrier Application, 2 M.C.C. 127, 141, wherein the Commission said: " * * * The Latin words 'bona fide' mean 'in good faith'. Webster's New International Dictionary defines 'bona fide' as 'in or with good faith; without fraud or deceit; real or really; actual or actually; genuine or genuinely'. As defined in Black's Law Dictionary, the words mean 'in or with good faith; honestly, openly, and sincerely; without deceit or fraud'."

In McDonald v. Thompson, 305 U.S. 263, 266, 59 S.Ct. 176, 178, 83 L.Ed. 164, Mr. Justice Butler, delivering the opinion of the Supreme Court construing Section 206(a), stated: "Exact definition of 'bona fide operation' is not necessary. As the Act is remedial and to be construed liberally, the proviso defining exemptions is to be read in harmony with the purpose

of the measure and held to extend only to carriers plainly within its terms. Piedmont & Northern R. Co. v. Interstate Commerce Commission, 286 U.S. 299, 311, 52 S. Ct. 541, 545, 76 L.Ed. 1115. To limit the meaning to mere physical operation would be to eliminate 'bona fide'. That would be contrary to the rule that all words of a statute are to be taken into account and given effect if that can be done consistently with the plainly disclosed legislative intent. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704; Ex parte Public National Bank, 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202. There is nothing to justify rejection of these qualifying words. The expression, 'in bona fide operation', suggests absence of evasion, excludes the idea that mere ability to serve as a common carrier is enough, includes actual rather than potential or simulated service, and in context implies recognition of the power of the State to withhold or condition the use of its highways in the business of transportation for hire. Plainly the proviso does not extend to one operating as a common carrier on public highways of a State in defiance of its laws."

In Eichholz v. Public Service Commission of Missouri, 306 U.S. 268, 622, 59 S. Ct. 532, 83 L.Ed. 641, a state of facts somewhat similar to those of the case at bar was passed upon by the Supreme Court. A three-judge District Court held valid an order of the Public Service Commission of Missouri which revoked Eichholz' permit as an interstate carrier and denied a permanent injunction restraining the Commission and certain state officers from prosecuting suits against him for using the highways of the state in the transportation of property for hire in interstate commerce. An appeal was taken to the Supreme Court which affirmed the decree of the District Court in so far as it denied the injunction sought by the appellant. The decision of the Public Service Commission of Missouri was based upon a finding that Eichholz as a subterfuge had hauled freight in St. Louis, Missouri, and destined to Kansas City, Missouri, and vice versa, through his terminal in Kansas City, Kansas, which was located less than half a mile from the Missouri line. The Commission also found that Eichholz had solicited the transportation of freight between St. Louis, Missouri, and Kansas City, Missouri, on the basis of a quoted interstate rate, much lower than the intrastate rate established by the Public Service Commission for transportation between the two cities. Rule 44 of the Public Service Commission of Missouri provided in part that no driver or operator operating under an interstate permit should " * * * accept for transportation within this State any person or property known to be destined to a point within the State of Missouri." The Supreme Court held that Rule 44 was designed to provide a safeguard against the use of an interstate permit to circumvent the requirement of a certificate for intrastate traffic. The Eichholz case appears to be nearly the converse of that at bar. The Supreme Court, by the Chief Justice, stated (306 U.S. at page 274, 59 S.Ct. at page 535, 83 L.Ed. 641): "If appellant's hauling of the merchandise in question across the state line was not in good faith but was a mere subterfuge to evade the State's requirement as to intrastate commerce, there is no ground for saying that the prohibition of the use of the interstate permit to cover such transactions, and the application of the Commission's rule prohibiting them in the absence of an intrastate certificate, was an unwarrantable intrusion into the federal field or the subjection of interstate commerce to any unlawful restraint." The language employed by the Supreme Court in the cited case, we think, casts illumination upon the common sense interpretation which must be given to the phrase "bona fide operation" employed in the grandfather clause of the Motor Carrier Act.

For the reasons given, we conclude that the Commission has correctly interpreted the phrase "bona fide operation" and with the full sanction of law has denied to the plaintiff the benefit of the grandfather clause.

### As to the Denial of a Certificate of Public Convenience and Necessity to the Plaintiff for the Transportation of General Commodities.

The plaintiff has also challenged the finding of the Commission that the plaintiff's transportation of commodities, other than silk and rayon and commodities to be used by silk and rayon textile plants, and hosiery, was sporadic and not continuous since July, 1935. The plaintiff has phrased its contentions upon this phase of the case in the following question appearing upon its brief, "Has plaintiff shown such bona fide interstate transportation of general commodities as would entitle it to a certificate of public convenience and necessity

for the transportation of the same?" The Commission found "* * * that applicant and its predecessor have transported other commodities * * * but such operations have been more or less sporadic and not continuous since June 30, 1935." The plaintiff contends that this finding of the Commission is not based on evidence. It also contends that there is nothing in the Act which refers to "sporadic transportation". It states that all that is required under the terms of the Act is that a carrier should have operated by motor vehicle on June 1, 1935, and that it has similarly operated since that time. It contends that what was intended by the grandfather clause was to preserve to the carrier the right to engage in the same sort of carriage which it had engaged in upon the grandfather date and prior thereto, and if the transportation was not a daily transportation but a seasonal or occasional transportation the Commission cannot deprive the carrier of his right to conduct such transportation.

We entertain no doubt that the Commission under the Act has the power to restrict the plaintiff to the type of service it was performing on June 1, 1935, not only as to the routes operated but also as to the class of commodities which it carried. While the Act does not confer such power in express terms we think that the existence of such a power is implicit in its provisions. A "common carrier by motor vehicle" is defined by the Act, Section 203(a)(14) (49 U.S.C.A. § 303(a)(14), as "any person who or which undertakes * * * to transport passengers or property, or any class or classes of property, for the general public * * *". Section 208(a), 49 U.S.C.A. § 308(a), provides that "any certificate issued under section 206 [306] or 207 [307] shall specify the service to be rendered * * *".

In United States v. Maher, supra, the Supreme Court stated, 307 U.S. at page 155, 59 S.Ct. at page 771, 83 L.Ed. 1162, by Mr. Justice Frankfurter, "The recognized practices of an industry give life to the dead words of a statute dealing with it." By the enactment of the Motor Carrier Act Congress intended to regulate the motor carrier industry. Those who drafted the Act were well aware that carriers by motor vehicle were specializing in the transportation of particular commodities. It was obviously the intention of Congress by the enactment of the grandfather clause to preserve to the carrier its right to transport commodities or articles in commerce of the kind which it was transporting on June 1, 1935. If the plaintiff's predecessor was engaged in the bona fide transportation of merchandise generally at the grandfather date and this transportation was carried on by the plaintiff thereafter, a certificate of public convenience and necessity to continue that transportation should have been granted by the Commission. If the plaintiff and its predecessor was not so engaged in transportation, the Commission committed no error in denying the application.

The question therefore becomes one of fact and we may not overrule the Commission's findings in this connection unless we find them to be arbitrary or capricious or not supported by substantial evidence.

Examination shows that a substantial part of the record which was before the Commission is not before this court. This includes way-bills which accompanied Exhibits A to Z and A-1 to A-28, inclusive. These latter are tabulations of way-bills purporting to show shipments over the routes under consideration prior to June 1, 1935, and thereafter. The latest date shown by these tabulations is June 29, 1935. Most of them are around the grandfather date. Assuming that the plaintiff's predecessor was in good faith engaged in the hauling of general merchandise at or near June 1, 1935, we have no substantial evidence before us to show the continuation of such transportation since the grandfather date. More important than this, however, an examination of the tabulation of way-bills does not support the contention of the plaintiff that it was engaged in the transportation of general merchandise. The tabulation indicates that the plaintiff's predecessor did transport some groceries or grocery products, and very small quantities of other merchandise in interstate commerce around the grandfather date. Considering the tabulation of way-bills as evidence, we would conclude, as did the Commission upon all the evidence before it, that the transportation of general merchandise by the plaintiff and its predecessor was sporadic and entirely incidental to its chief business, which was that of transporting silk, rayon, hosiery, and commodities for mills processing or manufacturing such commodities.

Moreover, the failure of the plaintiff to include in the record before us essential evidence is a bar to the jurisdiction of this court to pass upon the evidence upon which the Commission's findings were based. Louisiana & Pine Bluff R. Co. v. United States, 257 U.S. 114, 116, 42 S.Ct. 25, 66 L.Ed. 156, and Spiller v. Atchison, T. & S. F. Ry. Co., 253 U.S. 117, 125, 40 S.Ct. 466, 64 L.Ed. 810.

In making this statement we are not unaware of the burden which is placed upon the plaintiff if it is to be required to produce copies of all missing exhibits. The industry in which the plaintiff is engaged is a fiercely competitive one and therefore every proper concession should be made to permit the plaintiff to put its case before this court without undue expense. The plaintiff, however, has suggested no legally sufficient substitute for those portions of the record which have been omitted and we believe that, even if it did so, its position would not be improved materially. The record before us clearly supports the findings and order of the Commission.

The complaint will be dismissed.