## McFeaters v. Cooper-Bessemer Corporation

*Martin E. Cusick,* for plaintiff.
*Milford L. McBride,* for defendant.

Rowley, P. J., February 9, 1945.—This matter is before the court upon defendant's rule for judgment for want of a sufficient reply to new matter.

On December 23, 1942, plaintiff commenced this action to recover $3,287.97, the aggregate of numerous alleged undercharges on freight transported in motor truck by plaintiff for defendant between Grove City, Mercer County, Pa., and Mount Vernon, Ohio, during the period from April 27, 1937, to December 12, 1937.

The statement of claim avers "at, before and since the enactment of the Motor Carrier Act of 1935, Interstate Commerce Act, Part 2", plaintiff was engaged in the transportation of motor freight as a common carrier and, as such, served defendant between its plant in Grove City, Pa., and its plant in Mount Vernon, Ohio; that plaintiff filed his tariffs with the Ohio Motor Freight Bureau; that plaintiff became a member of National Freight Classification No. 2, effective February 28, 1937; that plaintiff's carriage for defendant became subject to such tariffs on April 26, 1937; that thereafter plaintiff transported for defendant certain shipments between Grove City, Pa., and Mount Vernon, Ohio, "and charged therefor a lesser rate than was filed with the Interstate Commerce Commission"; that the total of such undercharge is $3,-287.97; and that plaintiff is required to collect interest on the unpaid amount to be computed from February 16, 1938.

In its affidavit of defense, defendant denies that plaintiff is engaged in interstate commerce as a common carrier by motor vehicle; that plaintiff has any legal rates filed with the Ohio Motor Freight Bureau, or with the National Freight Classification or with the Interstate Commerce Commission; that plaintiff was in bona fide operation as a common carrier from April 27, 1937, to December 12, 1937; that plaintiff charged less than the lawful rates for any shipments transported by it for defendant.

The affidavit further avers that on July 1, 1935, plaintiff contracted with defendant to transport its freight at 20¢ cwt., except a few items to be charged at 36¢ cwt., which contract was in effect until December 10, 1937. Defendant avers that all its shipments were transported under such contract, that each shipment was by plaintiff billed in accordance with said contract, and that each bill was paid to plaintiff promptly on presentation. Defendant denies that plaintiff "had any greater legal rate filed and in effect with the Interstate Commerce Commission covering and applying to the shipments aforesaid".

Defendant further avers that plaintiff "was not a lawful common carrier under the provisions of Ohio law, Pennsylvania law, and the provisions of the Federal Motor Carrier Act".

### New matter and reply

The affidavit of defense also includes the following averments of new matter:

1. The shipments transported by plaintiff were made under a verbal contract of July 1, 1935, at 20¢ cwt. (Plaintiff's reply admits this averment.)

2. On February 12, 1936, plaintiff filed an application with the Interstate Commerce Commission to continue as a contract carrier. (Plaintiff's reply admits the averment and avers that plaintiff also filed his application for a certificate as a common carrier, and that on February 12, 1938, a certificate as a common carrier was granted and a certificate as contract carrier was denied.)

3. On December 1, 1936, plaintiff filed with the Interstate Commerce Commission a statement that he, as of July 1, 1935, had a special verbal contract with defendant to transport property, which contract has been uninterrupted to the date of application. (Plaintiff's reply admits this averment.)

4. Plaintiff's application for permit as a contract carrier was not acted upon by the commission until

after December 10, 1937. (Plaintiff's reply admits the averment.)

5. From April 27, 1937, to December 10, 1937, plaintiff did not comply with the provisions of the Motor Carrier Act of August 9, 1935, 49 Stat. at L. 543, and the rules and regulations thereunder relative to insurance of the cargo. (Plaintiff replies that this averment is a conclusion of law.)

6. The regulations of the Interstate Commerce Commission provide that the cancellation or expiration of a policy of insurance will render of no force any certificate in connection with which the policy was accepted, and all authority to operate can be lawfully exercised only so long as the security remains in effect. (Plaintiff replies that the averment is a conclusion of law.)

7. Cargo liability insurance was required to be carried by plaintiff and he did not carry any such. (Plaintiff replies that the averment is a conclusion of law, and adds that defendant sustained no loss due to such carriage.)

8. Effective February 15, 1937, plaintiff was required to carry automobile liability and property damage liability insurance, and plaintiff carried none from April 27, 1937, to June 8, 1937, and none from August 6, 1937, to December 10, 1937. (Plaintiff replies that the averments are mixed questions of law and fact, and adds that defendant sustained no loss due to such carriage.)

9. Plaintiff suffered his motor carrier automobile liability and property damage liability insurance which became effective June 9, 1937, to be canceled August 6, 1937. (Plaintiff's reply admits the averment.)

10. Plaintiff made no substitution of other security for the canceled insurance. (Plaintiff's reply admits the averment.)

11. Failure to provide required insurance revoked plaintiff's right to operate as a common carrier. (Plaintiff replies that the averment is a conclusion of law.)

12. During the period from August 27, 1937, to December 10, 1937, plaintiff was not in bona fide operation as a common carrier within the State of Ohio, and if operating as a common carrier such operation was in defiance of the laws of Ohio. (Plaintiff replies that the averment is a conclusion of law.)

13. C. A. McFeaters doing business as McFeaters Transfer was the predecessor in interest to plaintiff and held a certificate of public convenience and necessity from the Public Utilities Commission of Ohio until June 1, 1935. (Plaintiff's reply admits the averment, and adds "whereupon it was transferred to C. L. McFeaters", the instant plaintiff.)

14. The above certificate held by C. A. McFeaters was revoked by the Public Utilities Commission of Ohio on June 1, 1935. (Plaintiff's reply avers that said certificate was transferred to C. L. McFeaters, plaintiff, about June 1, 1935.)

15. Neither C. A. McFeaters, doing business as McFeaters Transfer, the predecessor in interest, nor C. L. McFeaters, plaintiff, was in bona fide operation in the State of Ohio on June 1, 1935. (Plaintiff's reply avers that on June 1, 1935, C. L. McFeaters or C. A. McFeaters, his predecessor in title, was a bona fide carrier in interstate commerce between the States of Pennsylvania and Ohio.)

16. Neither plaintiff nor his predecessor in interest held any certificate of public convenience and necessity from the Public Utility Commission of Pennsylvania on June 1, 1935. (Plaintiff's reply avers that he or his predecessor in title was on June 1, 1935, in bona fide operation as a common carrier between the States of Pennsylvania and Ohio.)

17. Any rights of C. A. McFeaters, predecessor in interest to plaintiff, in Pennsylvania to operate as a common carrier expired on December 1, 1934, and were never renewed. (Plaintiff's reply avers that he or his predecessor in title was in bona fide operation

as a common carrier between the States of Pennsylvania and Ohio.)

18. The application of Clarence Leroy McFeaters to operate as a common carrier was denied on May 16, 1939. (Plaintiff's reply denies the averment and avers that a certificate as a common carrier under the Motor Carrier Act of 1935 was granted to Clarence Leroy McFeaters on February 12, 1938.)

19. On November 10, 1936, the Public Utilities Commission of Ohio, for nonpayment of tax due the State of Ohio by plaintiff, revoked all certificates of public convenience and necessity previously issued to plaintiff. (Plaintiff's reply asserts that the averment is immaterial, as the service was rendered in interstate commerce.)

20. On June 1, 1935, the Public Utilities Commission of Ohio, for nonpayment of tax due the State of Ohio, revoked all certificates of public convenience and necessity previously issued to C. A. McFeaters, doing business as McFeaters Transfer, the predecessor in interest to plaintiff. (Plaintiff replies that the averment is immaterial.)

21. Neither plaintiff nor his predecessor in interest was in bona fide operation as a common carrier by motor vehicle in interstate commerce from April 27, 1937, to December 10, 1937. (Plaintiff replies that the averment is a conclusion of law.)

*Defendant's rule for judgment*

Defendant's motion for judgment for want of a sufficient reply to new matter assigns five reasons. We shall consider these seriatim.

I. Defendant averred that all shipments were made under a verbal contract at 20¢ cwt., and that the existence of such contract was affirmed by plaintiff in his application for a certificate as a contract carrier. Plaintiff's reply admitted the truth of these averments.

In our opinion, the facts thus admitted are not sufficiently comprehensive to permit disposition of the

matter upon that basis. If the oral contract was lawful, then we have an end of the matter.

But the facts upon which the legality of the contract depends are in dispute. Plaintiff avers lawful operation in interstate commerce as a common carrier. Defendant denies that plaintiff so operated. Plaintiff avers that he filed with the Interstate Commerce Commission a schedule of rates as required by the Motor Carrier Act of 1935, and that the compensation collected from defendant was less than that specified in the filed tariff. If plaintiff's averments in these respects are true, then he was expressly prohibited by law from making the oral contract averred.

So, also, if plaintiff was a contract carrier and had filed a schedule of rates with the commission, he could not lawfully contract to receive less than the minimum rates so filed.

But defendant avers that plaintiff was not operating in interstate commerce, either as a contract carrier or a common carrier, and that he had not filed with the commission a schedule of applicable rates either as a contract carrier or as a common carrier. If this be so, then it is obvious that plaintiff did not receive less than the filed rate.

Plaintiff claims that he or his predecessor was in bona fide operation as a common carrier by motor vehicle on June 1, 1935. Defendant denies the fact, but it seems conceded that on February 12, 1936, plaintiff filed with the Interstate Commerce Commission applications for certificate as a common carrier and certificate as a contract carrier.

These applications were disposed of by the commission on February 12, 1938, when a certificate as common carrier was granted, but the certificate as contract carrier was refused. Thus the matter was pending before the commission during the entire period here involved.

Pending grant of a certificate, a motor carrier may operate as a contract carrier and a common carrier if

the application is made for both contract carrier and common carrier: Thomas v. National Delivery Assn., Inc., 24 F. Supp. 171.

The undisputed averments do not establish the controlling facts, viz, regarding the filing of schedules with the commission, and as to plaintiff's status with respect to operation in interstate commerce.

II. Defendant averred that plaintiff failed to provide insurance for his cargo and insurance against automobile liability and property damage. The averments are undenied.

Defendant cites section 215 of the Motor Carrier Act, 49 U. S. C. §315, which declares that no certificate or permit issued to a motor carrier shall remain in force unless such carrier complies with the regulations of the commission governing the filing and approval of surety bonds and policies of insurance.

Defendant cites also a regulation of the commission effective February 15, 1937, which provides:

"The cancellation or expiration of a policy of insurance . . . will . . . render of no force any certificate, permit or license in connection with which such security was accepted or approved and all authority to operate granted by this commission can be lawfully exercised only so long as the security . . . remains in effect."

The cancellation of required insurance renders of "no force" any certificate, permit, or license. theretofore granted. The act prohibits operation "unless there is in force a certificate", consequently the carrier who operates when a certificate is not in force violates the law and subjects himself to the penalty prescribed by section 222 of the act (49 U. S. C. §322), to wit, a penalty of not less than $100 nor more than $500 for each day of violation.

If the instant suit be viewed purely as an action to recover for a service which plaintiff (because his certificate was not in force) was prohibited from per-

forming, it must fail. The general principle is that the transaction of business contrary to law should not receive the aid of courts by permitting recovery of compensation. Upon this principle recovery of commissions has been denied to an unlicensed insurance agent: Golder v. Rabinowitz et al., 125 Pa. Superior Ct. 573; to an unlicensed real estate broker: Luce v. Cook, 227 Pa. 224; to an unlicensed architect and engineer: F. F. Bollinger Co. v. Widmann Brewing Corp., 339 Pa. 289.

In the cases cited, it was argued that the penalty imposed by the prohibiting statute was intended to be the sole punishment for infractions thereof. The answer of the courts was that, if they were to enforce such unlawful contracts, the relatively small fines to which violators of the law are made subject would be insufficient to discourage repeated violations: F. F. Bollinger Co. v. Widmann Brewing Corp., supra.

"This rule rests upon the theory that since the law prohibits under a penalty the doing of business by unlicensed brokers, contracts providing for the payment of commissions to such persons are opposed to good morals and public policy and cannot be enforced . . .": Luce v. Cook, 227 Pa. 224, 225.

In Holt v. Green, 73 Pa. 198, it was said (p. 200):

"An action founded upon a violation of the laws of the United States or of this state, cannot be maintained in the courts of this state. . . .

"Nor is there any distinction in this state, whether the contract is *malum prohibitum* or *malum in se.* . . .

"The test whether a demand connected with an illegal transaction is capable of being enforced by law, is whether the plaintiff requires the aid of the illegal transactions to establish his case. . . .

"His right to recover in law, must depend upon his legal right to perform the services."

But in the instant case it is not clear that plaintiff's claim rests upon contract, certainly not upon the admitted oral contract. It may be that plaintiff is not

only entitled, but obliged, to collect in accordance with his filed rates. Part II of the Interstate Commerce Act of August 9, 1935, 49 Stat. at L. 543, bound both plaintiff and defendant to observe the filed rates. Plaintiff was forbidden to carry at a rate below the filed minimum, and defendant was prohibited, under penalty, from obtaining transportation for less than the applicable charge.

Operation in interstate commerce without a certificate is a clear violation of the *statute* itself. Operation by a certificate holder after cancellation of a policy of insurance is a violation, not of the statute, but of the *regulation* of the commission. The distinction may be important.

If the parties alone were concerned, the effect of the seemingly illegal operation would be less difficult to determine. The Interstate Commerce Act was intended to protect the interests of the public at large. We are not prepared to hold that the mutual rights and duties of plaintiff carrier and defendant shipper may not exist by virtue of their relationship, independent of express contract.

Section 206(*b*) of the Motor Carrier Act provides that an operator claiming benefit of the grandfather clause may continue to operate without a certificate for a period of 120 days after the effective date of the statute, and that "if application for such certificate is made to the Commission within such period, the carrier may, under such regulations as the Commission shall prescribe, continue such operation until otherwise ordered by the Commission."

Did the cancellation of plaintiff's insurance ipso facto suspend the right to operate specified in the section quoted above? The regulation of the commission hereinbefore quoted, which provides that such cancellation will "render of no force any certificate, permit or license" offers some support for the contention that plaintiff's right was so suspended. But it would seem

that the operation of this regulation may be modified by section 212 of the statute, which provides that certificates, permits, and licenses shall remain in effect "until suspended or terminated as herein provided." Section 212 seems to require a minimum notice of 15 days as a condition precedent to suspension except for violations not here pertinent.

In any event, cancellation of the insurance would not be a complete bar to plaintiff's recovery, since it is admitted that the insurance was in effect during a part of the period here involved.

III. Defendant avers that plaintiff was operating as a common carrier in the State of Ohio in defiance of the laws of the State of Ohio, and that the certificate held by his predecessor had been canceled by the Public Utilities Commission of Ohio on June 1, 1935. (Plaintiff replies that the certificate of his predecessor was transferred to him. Plaintiff avers that he or his predecessor was operating as a bona fide common carrier on June 1, 1935. The disputed facts thus presented cannot be determined at this point in the proceeding.)

It seems to be conceded that plaintiff's application for certificate as a common carrier and as a contract carrier were pending before the commission during all of the period embraced in plaintiff's claim, and that on February 12, 1938, a certificate as common carrier was granted.

Plaintiff claims to have operated as a common carrier during the period in question, April 27, 1937, to December 12, 1937, by virtue of his pending application under the grandfather clause of the statute. Defendant answers that because plaintiff was operating in defiance of the laws of Ohio, his pending application was not sufficient to authorize such operation. The contention being that one whose operations transgressed the laws of a State, within which a part of the operation occurred, was not comprehended in the clause, "in bona fide operation as a common carrier . . . over the

routes or within the territory for which application has been made."

Defendant cites Eastern Carrier Corp. v. United States, 31 F. Supp. 232, in support of its contention. This decision is not authority for the proposition that a carrier who transgresses the law or regulations of an authority of a State may not obtain a certificate for interstate operation.

In this case it will be noted that plaintiff's application included 10 routes. The commission granted the certificate as to seven routes which were found to be interstate, but refused a certificate for three routes between termini within Pennsylvania.

Notwithstanding that the Public Service Commission of Pennsylvania had theretofore issued an order requiring the carrier to cease transporting merchandise between points in Pennsylvania, the Interstate Commerce Commission found that the carrier was entitled to transport as a common carrier between Washington, N. J., and Philadelphia.

The facts in this case are an illustration of what is *not* bona fide operation in interstate commerce. The carrier having been prohibited from operating in Pennsylvania undertook to establish a route, between Pennsylvania termini, which entered New Jersey and immediately returned to Pennsylvania.

The obvious purpose of entering New Jersey was to acquire an interstate character which was expected to nullify the authority of Pennsylvania.

The Eastern Carrier decision, supra, rests upon the opinion of Eichholz v. Public Service Commission of Missouri et al., 306 U. S. 268, concerning which the former says (p. 237):

"The language employed by the Supreme Court in the cited case, we think, casts illumination upon the common sense interpretation which must be given to the phrase 'bona fide operation' employed in the grandfather clause of the Motor Carrier Act."

This "illumination" is as follows (p. 237) :

" 'If appellant's hauling of the merchandise in question across the state line was not in good faith but was a mere subterfuge to evade the State's requirement as to intrastate commerce, there is no ground for saying that the prohibition of the use of the interstate permit to cover such transactions, and the application of the Commission's rule prohibiting them in the absence of an intrastate certificate, was an unwarrantable intrusion into the federal field or the subjection of interstate commerce to any unlawful restraint.' "

In our opinion the term bona fide pertains to the character of cargo as to being actually interstate or merely simulated. But in McDonald v. Thompson, 305 U. S. 263, the opinion by Mr. Justice Butler seems to rule that a carrier operating on June 1, 1935, without authority from the particular State was not in bona fide operation within the meaning of the grandfather clause. In the McDonald case the carrier had failed to obtain from the Texas Railroad Commission the certificate of convenience and necessity required by the law of Texas of all carriers using the public highways. The carrier applied to the Interstate Commerce Commission for a certificate under the grandfather clause of the Motor Carrier Act. While this application was pending, he instituted proceedings to enjoin the Texas Railroad Commission from enforcing against him the State Motor Truck Law which required a certificate from the State of Texas. The Supreme Court held that he was not in bona fide operation within the meaning of the grandfather clause, since the State of Texas had formally rejected his application for a certificate authorizing operation as a common carrier in interstate commerce on the ground that the proposed operations would subject the highways named to excessive burdens and endanger and interfere with ordinary use by the public.

But we think the effect of the decision in the McDonald case, supra, was limited by the opinion in the

later case of Alton R. R. Co. et al. v. United States, 315 U. S. 15, 24, where it was said:

"The expression 'in bona fide operation' plainly 'does not extend to one operating as a common carrier on public highways of a State in defiance of its laws'. . . . Congress has not, however, conditioned rights under the 'grandfather clause' on compliance with state laws. Their violation is material only insofar as it may be relevant to establishing an absence of 'bona fide operation'. . . . The question whether his operation in a particular State was 'bona fide' is a question of fact for the Commission to determine. Such operation might well be in good faith though state laws were infracted. And the fact that an applicant may have to make his peace with state authorities does not necessarily mean that his rights under the 'grandfather clause' should be denied or withheld. . . . Occasional noncompliance with state laws does not *per se* establish a course of conduct which is preponderantly one of evasion."

The distinction between the McDonald case and the Alton case seems to rest upon the gravity of the violation of law. In the former case the right to operate was wholly denied. In the latter case the carrier was authorized to operate, but the manner of operation was hedged about by certain regulations. The complaint was that the carrier had offended some of these incidental regulations.

On June 1, 1935, did the instant plaintiff or his predecessor have the basic right to operate? Defendant avers that on that date the right of plaintiff's predecessor to operate was revoked by the Public Utilities Commission of the State of Ohio. On the contrary, plaintiff avers that the predecessor's right was transferred to plaintiff on or about June 1, 1935.

Thus there is a dispute as to this fundamental fact.

It must be conceded that the Interstate Commerce Commission has authority to decide as a matter of fact

whether plaintiff was in bona fide operation on June 1, 1935. On February 12, 1936, plaintiff filed his application with the Interstate Commerce Commission for a certificate as a common carrier. On February 12, 1938, such a certificate was issued to plaintiff. Apparently grant of this certificate by the commission affirmed the bona fide operation of plaintiff on June 1, 1935.. We are not at all certain of our power to review in a collateral proceeding this finding of the commission.

IV. Defendant avers that on November 10, 1936, all certificates of public convenience and necessity held by plaintiff in Ohio were revoked by the Public Utilities Commission of Ohio for nonpayment of taxes due the State of Ohio. (Plaintiff replies that the averment is immaterial.)

The foregoing averment seems to precipitate the question as to what extent, if at all, the Motor Carrier Act superseded the laws of Ohio with respect to interstate commerce by motor carrier.

Defendant's theory seems to be that revocation of the Ohio certificate ipso facto dissipated plaintiff's authority to operate in interstate commerce. Whatever may be said in support of this theory, we are not now prepared to say that the Ohio order of revocation, without more, is a bar to plaintiff's recovery of freight charges upon an interstate cargo transported after the date of such order.

V. Defendant's final reason in support of his motion for judgment is that the action is barred by the statute of limitation. This matter was set up in the affidavit of defense but opposing counsel desired that the matter be argued and disposed of in connection with the motion for judgment on the pleadings.

The shipments in question were made in the period from April 27, 1937, to December 12, 1937. The instant suit was begun December 23, 1942. Defendant contends that the right of action is limited by the Act

of Congress approved February 4, 1887, as amended and known as the Interstate Commerce Act (Part I), 49 U. S. C. 16, which in paragraph 3(a) provides:

"All actions at law by carriers subject to this chapter for recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after." (Period reduced to two years by amendment of September 18, 1940, 54 Stat. at L. 928.)

This contention of defendant is challenged by plaintiff who urges that by its very terms the limitation applies only to "carriers subject to this chapter". Section 1 of the act declares (49 U. S. C. §1):

"The provision of this chapter shall apply to common carriers engaged in—

"(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water.

"(b) The transportation of oil or other commodity . . . by pipe line.

"(c) The transmission of intelligence by wire or wireless . . ."

Prior to 1906 there was no provision in this chapter with respect to the time for bringing actions by carriers to recover their charges. After 1906, however, the State statutes were superseded with respect to actions covered by a provision of the Federal laws, which by amendatory acts, were finally made in 1924 to cover the subject: 49 U. S. C. §16, note p. 30.

The period of limitations was first prescribed by the Transportation Act of February 28, 1920, 41 Stat. at L. 457, which read:

"All actions at law by carriers subject to this *Act* for the recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after." (Italics supplied.)

It is to be noted that the Act of June 7, 1924, c. 325, substituted the words "carriers subject to this *Chap-*

*ter*" for the words of the Act of 1920, "subject to this *Act*".

The Act of September 18, 1940, includes the following:

"All actions at law by carriers subject to this *chapter* for recovery of their charges, or any part thereof, shall be begun within two years from the time the cause of action accrues." (Italics supplied.)

The Interstate Commerce Act originally consisted of but one part or one chapter. (Chapter and part synonymous: Alton R. R. Co. et al. v. U. S., supra.) A new part, designated Part II, was added to the original act by the Act of August 9, 1935. The Act of September 18, 1940, changed the style of citing the chapter from "Interstate Commerce Act" to "Part I of the Interstate Commerce Act".

If it could be said the prescribed limitation applied to all carriers subject to the *act*, and if we could regard the Motor Carrier Act as only an amendment to the earlier statute regulating interstate commerce, it might be said that the limitation of the earlier statute attached to the amending statute. But there was an evident purpose of Congress to differentiate these statutes. The Act of 1940, 54 Stat. at L. 899, amending the original act, provides:

"This part may be cited as part I of the Interstate Commerce Act."

The same act changed the designation of the Motor Carriers Act, and provided (p. 919):

"This part may be cited as part II of the Interstate Commerce Act."

The words of the limitation expressly apply to "carriers subject to this Chapter". Carriers subject to chapter I do not include motor carriers.

Chapter II applies only to motor carriers, and in express terms excludes motor carriers operated by a railroad, which is subject to chapter I; by a water carrier, subject to chapter XII; or by a freight forwarder, subject to chapter XIII.

Part II, or chapter II, did incorporate, by reference, certain portions of part I; for example, paragraphs 11 and 12 of section 20, which defined the liability of the initial carrier, etc. But in part II there is neither express limitation of the period in which the carrier must sue for his charges nor is there an incorporation in the later act by reference to the limitation prescribed in part I.

When the amendment of 1940, which reduced the limitation to two years, was enacted, there existed two distinct parts (or chapters) of the Interstate Commerce Act. It seems to us that the language employed in the amendment clearly restricted the provision to carriers regulated by part I, which does not include motor carriers.

Congress recognized an advantage in adding to the original Interstate Commerce Act a uniform limitation in substitution for the various State statutes. Something can be said in favor of adopting such a uniform limitation for all carriers, but in our opinion Congress has not yet so extended the provision.

The general rule is that in respect to the limitation of actions the law of the forum governs: Rosenzweig, Admx., v. Heller, 302 Pa. 279.

An action in assumpsit upon a simple contract is subject to the six-year limitation period: Act of March 27, 1713, 1 Sm. L. 76, sec. 1, 12 PS §31; which, as the law of the forum, will be applied: Mercer's Estate, 330 Pa. 475; conceding, of course, the authority of Congress to supersede, with respect to interstate commerce transactions, provisions of a State statute.

Defendant's motion for judgment presents questions which cannot be satisfactorily disposed of upon the pleadings alone.

We are of the opinion that this is not such a clear case as warrants entering summary judgment. The case is certainly not clear and free from doubt, and in like circumstances judgment should never be en-

tered on the pleadings: Pyles v. Bosler et al., 308 Pa. 297.

" 'Doubtful cases should go to trial, especially those involving intricate relations demanding an inquiry into the facts of the controversy': Helfenstein v. Line Mountain Coal Co., 284 Pa. 78, 81": Peabody v. Carr, 316 Pa. 413, 416.

We have not undertaken to pass on questions of law which may arise in the trial of the case. The reason is obvious. During the trial, or after all the evidence is in, the original view of the law may be somewhat modified or changed. Consequently, we do not foreclose any legal question argued by counsel.

". . . it is the kind of a case which can be developed only by a complete hearing of the testimony and of all the facts in connection with the transactions involved": Colonial Securities Co. v. Levy et al. (No. 2), 302 Pa. 329, 331.

"A court should never award a summary judgment in any case unless it is free from doubt, and one in which a jury trial would be useless": Koehring v. Ventresca, 334 Pa. 566, 567; Arcadia Theatre Co. v. Segall, 349 Pa. 412.

". . . judgment for want of a sufficient affidavit of defense should not be ordered except in clear cases": Helfenstein v. Line Mountain Coal Co., 284 Pa. 78.

"This ruling applies equally to the discharge of an order on a motion for judgment for want of a sufficient reply . . .": Colonial Securities Co. v. Levy et al. (No. 2), supra.

### Order

And now, February 9, 1945, this matter came on for argument upon defendant's rule for judgment for want of a sufficient reply to new matter, and the same was argued, whereupon, after due consideration, it is ordered, adjudged, and decreed that the rule be discharged.